YAHRAUS *v.* CONTINENTAL OIL COMPANY.

4-9448                                              239 S. W. 2d 594

Opinion delivered May 7, 1951.

Rehearing denied June 11, 1951.

*J. H. Carmichael, Jr.,* and *Josh W. McHughes,* for appellant.

*Moore, Burrow, Chowning & Mitchell,* for appellee.

HOLT, J. December 15, 1942, a written "Bulk Station Commission Agreement" was entered into between appellant and appellee, Continental Oil Company. The contract provided, in effect, that Yahraus would sell and distribute appellee's products to retail dealers, in De-Queen and certain adjacent territory, and for such service was to be compensated on a percentage of the sales as provided in the agreement. Appellant had never before sold oil and gas products. The contract was subject to termination by either party on ten days' notice, and contained no provision that either party should furnish any equipment to retail dealers to induce the handling of appellee's products. However, it is conceded that both parties did furnish certain dealers certain equipment to induce the handling of appellee's products.

The contract, among other things, contained the following provisions: "Representative, for the consideration hereinafter stated, agrees to take charge of plant and stock of Conoco located at DeQueen. * * * Items specified herein for commissions and expenses cover sole reimbursement to Representative for services to be rendered hereunder and expense of operation of plant and equipment and other expenses to be borne by Representative, and sole compensation to Representative for furnishing equipment and furnishing services of any necessary employees of Representative as herein provided. * * * Unload tank cars and other cars and promptly report the arrival, unloading and return of all cars consigned to above station of Conoco. * * * Solicit orders and make deliveries to the trade, take receipts from all parties to whom deliveries are made, report the receipt, delivery and shipment of stock according to instructions from Conoco and satisfactorily account for all stocks entrusted to him. * * *

"Faithfully transact the business in his charge and make reports, all in accordance with this agreement and instructions from the Division Manager of Conoco at Ponca City, Oklahoma. * * * Collect and remit promptly for all sales made. Any credit sales made by Representative which have not been duly authorized by the credit department of Conoco shall be at the sole risk of Repre-

sentative (appellant) and he shall be liable to Conoco for the payment of the amount of any and all such accounts arising out of any such sales, etc. * * * In consideration of the performance of this agreement by Representative and subject to the provisions herein Conoco will pay for said work and as commission and expense certain commissions as listed in said agreement. * * * Will furnish the necessary licenses (except auto and truck licenses) to cover the business of Conoco, etc. * * * No passenger other than an employee of Conoco, or of Representative shall be carried on such automotive equipment while engaged in and about Conoco's business."

December 29, 1947, appellee terminated the contract agreement with appellant, whereupon the present suit was filed by appellant in which he alleged that the above contract had been orally modified since its execution to provide: "When the appellant (Yahraus) found a prospective retailer in each and every instance he would take the matter of supplying such equipment up with the appellee and was instructed by the appellee that the appellee would not furnish equipment to such prospective retail dealers and the appellee agreed with the appellant for the appellant to furnish such equipment to said dealers, and in consideration therefor the retail dealers would become the individual customers of the appellant," that appellee had breached the contract and sought damages which he alleged he had sustained by reason of unlawful and fraudulent interference with his customers causing them to breach their contracts with appellant, for alleged confiscation and conversion of filling station equipment owned by him and for punitive damages for malicious, willful and unlawful confiscation and conversion of appellant's property.

Appellee answered with a general denial.

At the close of all the testimony, the trial court gave a peremptory instruction to the jury to return a verdict for the appellee. This appeal followed.

The question presented is whether the court erred in taking the case from the jury. In deciding this question, we must determine whether there was substantial evi-

dence to support either of the following contentions of appellant: "That the Bulk Station Commission Agreement was modified; that the appellee unlawfully interfered with appellant's customers, causing said customers to breach their contracts with the appellant to his injury; or that appellee converted appellant's property to its own use."

We must also keep in mind our well established rule that "in determining on appeal the correctness of the trial court's action in directing a verdict for either party, the rule is to take that view of the evidence that is most favorable to the party against whom the verdict is directed, and where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it is error to take the case from the jury." *Barrentine* v. *The Henry Wrape Company*, 120 Ark. 206, 179 S. W. 328.

The undisputed evidence shows that appellee and appellant occupy the position of principal and agent, respectively, under the written Bulk Station Commission Agreement here in question. This relationship imposed certain well defined duties and obligations on appellant.

"It is well settled that an agent is a fiduciary with respect to the matters within the scope of his agency. The very relation implies that the principal has reposed some trust or confidence in the agent. Therefore, the agent or employee is bound to the exercise of the utmost good faith and loyalty toward his principal or employer. He is duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto. His duty is to act solely for the benefit of the principal in all matters connected with his agency. This is a rule of common sense and honesty as well as of law. Any custom subversive of this principle must be deemed to be unreasonable, opposed to the policy of the law, and hence of no effect. Indeed, it has been stated that in the usual case, it is the duty of the agent to further his principal's interests even at the expense of his own in matters connected with the agency. But no presumption of fraud will be

deemed to arise against an agent unless it appears that he has personal interests conflicting with those of the principal.'' 2 Am. Jur., § 252, pp. 203-204.

. It is undisputed that appellant sold appellee's products on a percentage commission basis. The more retail dealers he induced or procured to sell Conoco products, obviously the greater would be his earnings. There was nothing in the contract to prevent either appellant, or appellee, from furnishing any equipment to prospective retail dealers to induce them to handle Conoco products. Neither, however, was required under the contract to do so. Appellant did furnish a number of dealers certain equipment and when his contract was terminated all of this equipment, or its value, was returned to appellant. It is undisputed, in fact, Yahraus readily admitted, that his agreement with these retail dealers was ''to buy Continental products as long as he used my equipment'' and that they bought only Conoco products from appellant as Conoco's agent ''until I was checked out and wouldn't supply them any more.''

But, as above indicated, appellant says he had an oral agreement with the Oil Company, aside from the written agreement, to the effect that should appellant furnish certain equipment to dealers, then any such dealers were to become appellant's individual customers and not Conoco's.

On this point, appellant testified: ''Q. Before you bought the equipment and put it in the station at W. H. Lightfoot's, known as Hillcrest Service Station, did you talk to the Continental Oil Company? A. I talked to J. T. Davis, District man. Q. What was that conversation? A. The same as with Boots (Dover). I could get no credit or Continental to furnish the equipment. In every case they refused to furnish the equipment. I said I have this man ready to go with me, if you don't want to do it I would like to do it and they said if you want to do it yourself go ahead, we won't do it. * * *

''In each and every case, without any exception, prior to the time I installed any equipment I first took it

up with J. T. Davis, Continental Oil's District supervisor, and he said the Continental Oil Company would absolutely refuse to install any equipment at any new account. They didn't want any account if they had to furnish any equipment. I told Davis since I had taken up time trying to get the account I would like to go ahead and furnish the equipment myself and he said if you want to go ahead and take that account on for your own and furnish equipment well go ahead. Then I went back to the dealer and told him I would furnish the equipment and install it under one condition, that he buy all his petroleum products from me for at least a year and as long thereafter as he used my equipment. * * *

"Q. If I understand your theory of this case, what your complaint is, you came to the conclusion if you went out and got a new customer to handle Continental Oil Company's products under the provisions of this agreement and you say to Continental the customer won't sign up unless you let him have a truck lift, two computing tanks (pumps), this, that and the other and the company said we don't think it is profitable and we refuse to do that and you would say I will and you went out and installed it, you conclude by virtue of that fact that that party became your customer? A. Absolutely. Q. You base that conclusion solely on that? A. If he promises to buy Continental Products as long as he used my equipment. Q. At the very time you did that you were attempting to carry out the provisions of this contract? A. Absolutely."

While much of appellant's testimony (all of which we do not detail) appears to be somewhat conflicting and vague, we are unable to say, as a matter of law, that a case was not made for the jury.

Reversed and remanded.

GRIFFIN SMITH, C.J., and ROBINSON, J., dissent.

GRIFFIN SMITH, Chief Justice, dissenting. I would affirm the judgment. It is true that appellant undertook to prove a subsequent oral contract, but when pressed on cross-examination he invariably fell back upon the agency agreement. Furthermore, his knowledge of

the business in hand was sufficient to put any reasonable person on notice that the so-called conversations with Davis could not amount to company representations constituting variants from the written contract. There was no contradiction of testimony that any arrangements made by Davis—conceding, for the sake of argument, that the conversations occurred in circumstances where the construction given by Yahraus could attach—would have to be ratified by the home office. There are instances (and this is one of them) where the testimony of an interested party is so vague, uncertain, contradictory, and altogether unreliable, that a trial court is warranted in finding that it is wanting in that substantial quality necessary to sustain a verdict. I agree with Judge Cockrill that the legal sufficiency of the evidence relied upon became a judicial question, hence a verdict for the defendant was properly instructed.