SEXTON LAW FIRM, P.A., and Sam Sexton, Jr.
*v.* Phillip J. MILLIGAN

97-52                                              948 S.W.2d 388

Supreme Court of Arkansas
Opinion delivered June 30, 1997

*Matthew Horan*, for appellants.

*John Everett*, for appellee.

R OBERT L. B ROWN, Justice. Appellants Sexton Law Firm, P.A., and Sam Sexton, Jr. (Sexton), appeal a judgment in favor of appellee Phillip J. Milligan on Sexton's claim of breach of contract, claiming error by the trial court in excluding certain evidence. Sexton further claims that the trial court erred in directing a verdict in favor of Milligan on his claims of fraud and breach of fiduciary duty. We agree that the trial court erred in excluding evidence of the Firm Handbook as well as evidence of the arrangements with other attorneys associated with the Sexton Law Firm. We further agree that the trial court erred in directing a verdict on the fraud and breach-of-fiduciary-duty counts. We reverse the trial court on these points and remand the matter for further proceedings.

This litigation arose out of the arrangement struck between Sexton and Milligan relating to Milligan's practice of law between April 1, 1992, and November 1, 1995. Certain facets of that arrangement are not in dispute. Sexton was to provide Milligan with office space, utilities, telephone services, advertising, library facilities, stationery, clerical and secretarial services, and other expenses necessary to the practice of law. Milligan would receive 50 percent of all attorney fees generated by cases assigned to him minus expenses incurred in the preparation and trial of such cases. For cases that were either dismissed or unsuccessfully tried, Milligan and Sexton would equally divide the costs incurred during representation. Milligan would be assigned cases based on a rotation system set up by Sexton for all attorneys working at the law firm with similar arrangements.

On Saturday night, November 1, 1995, Sam Sexton was advised that Milligan was loading case files from the law firm into

his Ford Explorer. Sexton called Milligan and was assured that he was merely moving closed files that were taking up space in his office to storage. The following Monday Sexton learned that Milligan had cleared out his office and had removed multiple closed and open case files from the law firm premises. Milligan does not deny taking the files but has contended throughout that the clients involved were his clients — not Sexton's.

On February 27, 1996, Sam Sexton and the professional association of which he was sole shareholder filed an amended complaint against Milligan and alleged that Milligan, an independent contractor, had breached his agreement with the law firm. Sexton further alleged that commencing in February 1995, Milligan devised a scheme where Sexton would incur substantial expense for the preparation of certain cases assigned to Milligan only to have Milligan leave and open his own law firm with the intent to keep all fees generated. Sexton sought an accounting for moneys owed and injunctive relief to prevent the destruction of files taken and to require their return based on claims of breach of fiduciary duty and interference with contractual relations. He also asserted a claim for fraud and deceit and asked for both compensatory and punitive damages.

Milligan answered and admitted that he entered into an oral contract with Sexton that established his relationship as an independent contractor. He denied that the agreement encompassed the terms of the law firm's handbook on procedure ("Firm Handbook"). He asserted that his relationship with the law firm was one of independent contractor and that he had formed a professional association known as "Phillip J. Milligan, Inc."

Sexton moved for a jury trial on the fraud count. He urged that the chancery court decide the issues of equitable relief (the accounting and the restraining order) but empanel a jury and accept its recommendation for the claims for compensatory and punitive damages. Both sides agreed to this, and the trial court approved submission of the breach of fiduciary duty and fraud counts for a binding verdict. Sexton then filed a second amended complaint that added a claim for breach of contract, which was also agreed to be submitted to the jury.

At trial, Milligan was called by Sexton as a witness and testified about his arrangement with Sexton, as already described. He testified that this arrangement remained the same throughout his experience with Sexton, and that the agreement was the same as that for the other attorneys who were with the firm when he joined. Because Milligan was new to the practice of law and had yet to achieve a client base, part of the agreement included a six-month probationary period, where Sexton agreed to advance Milligan $2,000 per month for living expenses. According to Milligan, the agreement was waived after three months because 50 percent of the fees he had generated at that time exceeded the $2,000 per month advance. He testified that he received assistance from members of the firm on cases and offered assistance to other attorneys in return. He testified about occasional meetings of attorneys headed by Sexton for the discussion of cases and admitted that on at least one occasion attorneys were required to submit a memorandum on the number of open cases and possible fees to be recovered. He testified about several forms used in the firm and particularly about the attorney-client form, which listed individual attorneys like Milligan as well as "Sexton Law Firm, P.A."

Three case files taken by Milligan were focal points in this litigation. First, there was the *Watson* case. Milligan testified that he met John Watson on March 1, 1993, in the firm's offices and represented him on an IRS matter. During the course of this representation, Watson and his wife were involved in an automobile accident and suffered serious physical injury. Milligan testified that, per Watson's request, he entered into an attorney-client agreement naming himself individually as the attorney on the personal-injury claim and reduced his contingency fee from 33 1/3 percent, which was the customary amount at the Sexton Law Firm, to 25 percent. He admitted that he did not inform Sexton that he signed the attorney-client agreement in his individual name because he did not believe it was necessary to do so. Milligan testified that, at the time he entered into the agreement, he was still bound to share 50 percent of his fees with the Sexton Law Firm. He testified, however, that if his client received a recovery after he left the firm, the law firm had no claim to a share of his fees. Milligan admitted that he started making plans to leave the

Sexton Law Firm in the late summer or early fall of 1995. He settled the *Watson* case in July 1996 for $1,314,000.

Milligan also discussed the *Mary Jane Wood* case, which was assigned to him by Sexton after the departure of another attorney from the law firm. He admitted that on September 19, 1995, while he was still associated with the firm, he caused a letter to be sent to opposing counsel offering a settlement for $150,000 that was written on the letterhead of "Milligan Law Offices." That letterhead contained the address of a Fort Smith post-office box. On October 5, 1995, Milligan sent a letter recognizing a $140,000 settlement of the case, which stated: "PLEASE TAKE NOTE OF MY NEW ADDRESS AND FIRM NAME." Subsequently, the settlement payment was sent to Milligan's post-office box address. Both the September 19 and October 5, 1995 letters were prepared by a secretary provided by the Sexton Law Firm, with the use of firm stationery and postage. Milligan agreed that the *Mary Jane Wood* settlement sheet, dated November 9, 1995, reflected that he received attorney fees in the amount of $46,666.20 but disagreed that the Sexton Law Firm had any entitlement to 50 percent of that amount. The funds from the settlement were distributed eight days after his departure from the firm.

Milligan settled another case involving Bonnie Scandrett. Using his personal letterhead, a settlement was effected during his association with the Sexton Law Firm. The *Scandrett* settlement sheet, dated November 15, 1995, reflected an attorney fee of $18,750. Milligan acknowledged that the Sexton Law Firm paid some of the expenses associated with the case but admitted that none of these funds were paid to the law firm. Milligan admitted that the settlements from the *Mary Jane Wood* and *Scandrett* cases allowed him to spend approximately $30,000 in expenses associated with the *Watson* case.

Milligan testified that he departed from the Sexton Law Firm at approximately 10:00 p.m. on Saturday night, November 1, 1995, with the files and told Sam Sexton that he was moving closed files. He did not inform Sexton at that time that he was leaving the firm. Eventually, Milligan removed all of his files and

ordered his secretary to download associated information from the firm's computer onto floppy disks.

On cross-examination by his own counsel, Milligan stated that he believed his status with the Sexton Law Firm to have been that of an independent contractor. He pointed to the allegations in Sexton's own complaint and to the fact that Sexton treated him as an independent contractor for income-tax purposes. He denied that his oral contract was governed by the Firm Handbook but admitted that other attorneys, who joined the firm after he did, signed a written contract and were likely subject to the handbook's provisions.

Milligan also believed that Sexton was not performing pursuant to contractual obligations. At the time he left the firm, he had only been reimbursed for $800 of the $2,000 worth of expenses he had incurred during his work on the *Watson* case. He also explained that he was not receiving his equal share of cases under the firm's rotation system.

He testified that although he received the *Mary Jane Wood* case from an attorney in the firm, he was the attorney responsible for effecting the settlement. As to the *Scandrett* case, he stated that he was the only attorney who worked on the file. With respect to the *Watson* case, he explained that the bulk of the work performed which resulted in the settlement occurred after his departure. He testified that in the months leading up to the July 1996 settlement, he devoted 50 to 75 percent of his private practice to the case.

Sam Sexton testified that Milligan joined the firm under the same conditions as did all other attorneys that he had associated with the law firm. Sexton testified that he regularly met with attorneys in the firm to review the status of open cases and that he established policies for attorneys to follow while associated with the firm. He testified that on April 9, 1993, he sent a 41-page memorandum, or handbook on procedure, to all attorneys and that Milligan acknowledged receipt of the Firm Handbook. Sexton also testified that he was not aware of unpaid expenses to Milligan because they were not properly requested pursuant to the firm's billing system.

Sexton stated that he had no idea Milligan was leaving the law firm on Saturday night, November 1, 1995. When he spoke to Milligan that evening, Milligan told him that he was moving a number of closed files to storage because they were taking up space in his office. Sexton then learned the following Monday that Milligan had cleared out his entire office and left with over 260 closed and 69 open files. He testified that he relied on Milligan's representation that he was not absconding with the files and said he suffered because he was unable to take an inventory of the files before Milligan's departure. He testified that he would have prevented Milligan from taking the files of long-standing clients and that he would have retained certain files as evidence had he known that Milligan had already effected settlements without intending to share 50 percent of the fees received.

Sexton stated that he had two meetings with Milligan during the week following his departure. He further stated that he presented Milligan that week with three separate audits of funds Milligan owed the firm for expenses incurred during litigation. The first audit represented a sum due in the amount of $30,432.26; the second reflected $23,902.11; and the third was for the sum of $22,258.12. Sexton testified that repayment of the expenses was due at that time, rather than at the time the cases were ultimately settled, because the firm was not going to finance him at his new location. Sexton asserted that he made no demand for fees received from the *Mary Jane Wood* and *Scandrett* cases, again because he did not know that they had already been settled from his office.

Sexton testified that Milligan owed the firm $198,332 in fees collected on open files that Milligan eventually settled, including fees on the *Mary Jane Wood*, *Scandrett*, and *Watson* cases. He further stated that Milligan owed $18,129.29 for expenses on cases that he had taken with him and for cases that he had lost while he was at the firm. After Sexton's case-in-chief, Milligan moved for a directed verdict on the claim for breach of fiduciary duty and on the fraud count. The trial court granted both motions.

The jury returned a verdict for Milligan on the contract claim, and judgment was entered accordingly.

### I.   Contract Claim

Sexton raises several points for reversal, but we first address his claim that the trial court erred in excluding the Firm Handbook.  At trial, Sam Sexton testified at length about the agreement he struck with Milligan and how Milligan's conduct, as well as the conduct of all attorneys at the firm, was to be governed in part by the Firm Handbook.  He specifically testified that on April 9, 1993, he circulated the handbook to all attorneys in the firm and testified that Milligan acknowledged its receipt.  The trial court excluded the handbook because Milligan did not specifically testify that his agreement was subject to change by a handbook and because the change by the handbook was not supported by consideration.

■   The case of *Crain Industries, Inc. v. Cass*, 305 Ark. 566, 810 S.W.2d 910 (1991), is instructive on this point.  In that case, this court cited with approval the following language from the Supreme Court of Minnesota's decision in *Pine River State Bank v. Mettille*, 333 N.W.2d 622 (Minn. 1983):

> If the handbook language [is sufficiently definite to constitute] an offer, and the offer has been communicated by dissemination of the handbook to the employee, the next question is whether there has been an acceptance of the offer and consideration furnished for its enforceability.  In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation.  In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract.  The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer.  [Footnotes omitted.]

*Crain Industries v. Cass, Inc.*, 305 Ark. at 573, 810 S.W.2d at 914.  *See also Childs v. Adams*, 322 Ark. 424, 909 S.W.2d 641 (1995) (a party's manifestation of assent to a contract is judged objectively and may be proved by circumstantial evidence).

■ We conclude that in the present case Sexton laid a foundation that Milligan, whether deemed an employee or independent contractor, received the handbook in April 1993 and remained on the job and continued to retain the benefits of his association with the law firm until November 1, 1995. Using the rationale of our holding in *Crain Industries, Inc. v. Cass, supra,* we hold that the trial court erred in excluding the handbook from evidence and that Sexton is entitled to a new trial on the breach-of-contract claim.

Also at trial, Sexton attempted to introduce the testimony of former and present attorneys at the Sexton Law Firm regarding their agreements with the law firm. The point was to establish that these attorneys were required to remit 50 percent of the fees they achieved from open files that they took with them, as Milligan was also required to do. At one point during trial, Milligan admitted that he had the same arrangement with Sexton as did those attorneys who were at the law firm when he joined.

■ Milligan correctly contends that *Morrow v. McCaa Chevrolet Co.,* 231 Ark. 497, 330 S.W.2d 722 (1960), stands for the proposition that a trial court may act within its discretion in excluding cumulative evidence. *See also Hicks v. State,* 327 Ark. 727, 940 S.W.2d 855 (1997); *Elk Corp. of Arkansas v. Jackson,* 291 Ark. 448, 725 S.W.2d 829 (1987), *reh'g denied,* 291 Ark. 458-A, 727 S.W.2d 856 (1987). Nevertheless, in this case, the testimony of the other attorneys would have been highly probative of Milligan's agreement with Sexton; without the testimony, the jury was left to determine only whether to believe the testimony of Sexton or Milligan. We fail to agree that the testimony would have been merely cumulative. *Cf. Childs v. Motor Wheel Corp.,* 164 Ark. 149, 261 S.W. 28 (1924) (reversing trial court's decision to exclude the terms of a written contract to prove the terms of a subsequent oral contract embodying the same agreement). We conclude that the attorney contracts were admissible and that the trial court abused its discretion in excluding them.

## II. Breach of Fiduciary Duty and Fraud

Sexton also claims that the trial court erred in directing a verdict on his counts for breach of fiduciary duty and fraud.

In reviewing an order granting a motion for directed verdict, this court views the evidence in the light most favorable to the party against whom the verdict was directed. *Lakeview Country Club, Inc. v. Superior Prods.*, 325 Ark. 218, 926 S.W.2d 428 (1996); *Higgins v. General Motors Corp.*, 287 Ark. 390, 699 S.W.2d 741 (1985). If any substantial evidence exists that tends to establish an issue in favor of that party, it is error for the trial court to grant the motion for directed verdict. *Lakeview Country Club, Inc. v. Superior Prods., supra.*

When the trial court granted a directed verdict on Sexton's claim for breach of fiduciary duty, it stated as follows:

> Well, there [have] been allegations of a breach of a fiduciary duty. And I've explained to both of you my feelings on that. *Certainly both parties owed a fiduciary duty to each other.* And they owed fiduciary [duties] to their clients. I don't see, though, a separate cause of action for breach of fiduciary duty for this reason. If, in fact, Mr. Milligan did breach his contract, then that included breaching fiduciary duty, I think, to the Sexton Law Firm. (Emphasis added.)

The trial court apparently ruled that Milligan owed a fiduciary duty to Sexton, and we have held that that determination is a matter of law. *See Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996). The court's ruling was not challenged by Milligan on cross-appeal. Accordingly, we do not decide the issue of whether a fiduciary duty was owed by Milligan under these circumstances but accept the unchallenged ruling of the trial court for purposes of this discussion.

After deciding that a fiduciary duty was owed, the trial court went forward and refused to submit the claim to the jury on the basis that the claim for breach of fiduciary duty was included within Sexton's claim for breach of contract. This was error. First, Sexton was entitled to have the two claims of breach of contract and breach of fiduciary duty considered by the jury if both

were supported by substantial evidence. While the doctrine of election of remedies bars more than one recovery on inconsistent remedies, the doctrine does not limit the number of causes of action asserted by a plaintiff to be submitted to the jury. *Cater v. Cater*, 311 Ark. 627, 846 S.W.2d 173 (1993); *Westark Specialties v. Stouffer Family Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992).

■    Additionally, claims for breach of fiduciary duty and breach of contract are not identical causes of action. A person may be liable for breach of contract if the complaining party can prove the existence of an agreement, breach of the agreement, and resulting damages. *See Rabalais v. Barnett*, 284 Ark. 527, 683 S.W.2d 919 (1985). But a person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. *Long v. Lampton, supra.* It follows that, regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *See Berry v. Saline Memorial Hosp.*, 322 Ark. 182, 907 S.W.2d 736 (1995); *Texas Oil & Gas Corp. v. Hawkins Oil & Gas, Inc.*, 282 Ark. 268, 668 S.W.2d 16 (1984); *Yahraus v. Continental Oil Co.*, 218 Ark. 872, 239 S.W.2d 594 (1951). The guiding principle of the fiduciary relationship is that self-dealing, absent the consent of the other party to the relationship, is strictly proscribed. *See Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262 (1995).

■    Sexton testified that Milligan engaged in self-dealing to the law firm's detriment. Sexton further testified that without knowledge and consent, Milligan used firm resources to achieve settlements and attorney fees in the *Mary Jane Wood* and *Scandrett* cases. According to Sexton, these fees then provided Milligan with the resources to finance a settlement in the *Watson* case, which resulted in substantial legal fees to the exclusion of the Sexton Law Firm. The evidence is buttressed by proof that Milligan misrepresented the removal of open and closed files to Sexton on the night of Saturday, November 1, 1995. Under these unique circumstances, and, again, without deciding the issue of whether a fiduciary duty was owed by Milligan to Sexton, we hold that the trial court erred in granting Milligan's motion for directed verdict on Sexton's claim for breach of fiduciary duty.

The trial court also granted a directed verdict on the fraud count because clients have "an absolute right to pick the lawyer they want, and an absolute right to get their material." Unquestionably, the client owns his file. However, as this case makes clear, attorneys have an interest in files in connection with potential fees, and Sexton claims that Milligan defrauded him of his share of those fees. Particularly, Sexton claims that Milligan, as part of a larger scheme, intentionally misrepresented to him on the night of November 1, 1995, that he was taking files to storage as opposed to relocating them to his new practice. Sexton contends that the truth would have caused him to take action to prevent settlement checks on the *Mary Jane Wood* and *Scandrett* cases from being sent to Milligan's address. Essentially, Sexton asserts that Milligan's misconduct eliminated the possibility that he could stop the resulting damage.

■ Under Arkansas law, the following elements must be established by a preponderance of the evidence in order to establish a claim for fraud: (1) a false representation, usually of material fact; (2) knowledge or belief by the defendant that the representation is false; (3) intent to induce reliance on the part of the plaintiff; (4) justifiable reliance by the plaintiff; and (5) resulting damage to the plaintiff. *Calandro v. Parkerson*, 327 Ark. 131, 936 S.W.2d 755 (1997); *Clark v. Ridgeway*, 323 Ark. 378, 914 S.W.2d 745 (1996).

■ Viewing the evidence in the light most favorable to Sexton, as we must do, Sexton had acquired a 50 percent interest in any attorney fees acquired from the open files taken by Milligan. Sexton testified that on November 1, 1995, Milligan misrepresented his actions with the intent that they be relied upon by Sexton for the purpose of acquiring a 100 percent interest in attorney fees that would soon thereafter be achieved. Sexton further testified that he relied on that misrepresentation and was severely damaged. We conclude that there was substantial evidence that Milligan's conduct was the type of misfeasance that constituted fraud and that the issue should have gone to the jury. *See Westark Specialties v. Stouffer Family Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992); *L.L. Cole & Sons, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984).

### III.   Remaining Issues

Because we remand this matter for further proceedings, we will address two issues likely to arise on retrial.

#### a.   Customs and Practices of the Legal Profession.

Prior to trial, Milligan moved *in limine* to preclude Sexton from introducing the testimony of Howard Brill, a professor at the University of Arkansas School of Law, on the ground that the application of the Model Rules of Professional Conduct had no relevance to the litigation. At trial, Sexton attempted to elicit testimony from Brill on what is customarily done in the legal profession by an attorney when he plans to leave a law firm. The trial court excluded Brill's testimony for the reason that custom and usage was simply not relevant and stated that it believed you could find law firms that had agreements "both ways."

The trial court was correct. In this case, there were two interpretations of the agreement between Milligan and Sexton. Milligan asserted that he was absolutely not required to share fees that were received after his departure from the firm, while Sexton contended that Milligan did, in fact, bind himself to the payment of such fees. According to Sexton himself, the contract was neither ambiguous nor silent on the relevant terms. The decision of whether to allow expert testimony is a matter within the trial court's discretion, and the trial court will not be reversed absent an abuse of that discretion. *Williams v. Ingram.* 320 Ark. 615, 899 S.W.2d 454 (1995); *Sims v. Safeway Trails, Inc.*, 297 Ark. 588, 764 S.W.2d 427 (1989). What is customary or usual within the legal profession has no bearing when the parties are at loggerheads over whether Milligan had agreed to pay 50 percent of fees after leaving the firm. The trial court correctly excluded the testimony of Professor Brill.

#### b.   Evidence of Expense Audits.

The record reflects that before trial, Sexton moved *in limine* to preclude evidence of the three expense audits or accountings issued to Milligan during the week following his departure in the

amounts of $30,432.26, $23,902.11, and $22,258.12, respectively. Sexton characterized this correspondence as having occurred during the course of settlement negotiations and sought their exclusion based on considerations of relevancy.

Rule 408 of the Arkansas Rules of Evidence provides:

> Evidence of (1) furnishing, offering, or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for, invalidity of, or amount of the claim or any other claim. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion if the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

*Id.* The first question becomes whether Sam Sexton by sending the expense audits was "furnishing, offering, or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount[.]"

This court has made it clear that Rule 408 does not provide a blanket protection against the admission of all evidence concerning offers of compromise. For example, the rule does not prohibit evidence when it is offered for reasons other than proving "liability for, invalidity of, or amount of the claim or any other claim." *Ozark Auto Transp., Inc. v. Starkey*, 327 Ark. 227, 234, 937 S.W.2d 175, 178 (1997), *quoting McKenzie v. Tom Gibson Ford, Inc.*, 295 Ark. 326, 332-33, 749 S.W.2d 653, 657 (1988). The decision on whether the probative value of admitting the correspondence is substantially outweighed by its prejudicial effect is left to the sound discretion of the trial court, and absent a manifest abuse of that discretion, the trial court's decision will not be disturbed. *Ozark Auto Transp., Inc. v. Starkey, supra*; *Swindle v. Lumbermens Mut. Cas. Co.*, 315 Ark. 415, 869 S.W.2d 681 (1993); *McKenzie v. Tom Gibson Ford, Inc., supra.*

Milligan asserts that the trial court properly admitted the correspondence because it was relevant to Sam Sexton's credi-

bility because he made no demand at that time for 50 percent of the attorney fees Milligan was to receive from files he took. We hold that Milligan's contention presents another purpose under Rule 408 for admitting the expense audits into evidence. There was no abuse of discretion by the trial court in receiving them.

Reversed and remanded.