Clifford B. ALLEN *v.* Muriel ALLISON, Pat Merry, George
Fitzsimmons, and Gray & Ritter, P.C.

03-24 155 S.W.3d 682

Supreme Court of Arkansas
Opinion delivered March 11, 2004

*Durett and Coleman,* by: *Gerald A. Coleman,* for appellant.

*Butler, Hicky, Long & Harris,* by: *Andrea Brock,* for appellee.

*James R. Wallace & Associates,* by: *Kimbery Bosshart,* for appellee Muriel Allison.

JIM HANNAH, Justice. Appellant Clifford Allen appeals the summary judgment order entered against him in his suit against appellees Muriel Allison, Pat Merry, George Fitzsimmons, and Gray & Ritter, P.C., seeking damages for civil conspiracy, breach of fiduciary duty, outrage, fraud, and breach of warranty. In addition, Allen appeals a ruling by the trial court that the Arkansas Model Rules of Professional Conduct are inadmissible in this action. We affirm the trial court's grant of summary judgment on all claims. We also affirm the trial court's ruling that the rules of professional conduct are inadmissible in this case. This case involves an issue of first impression; thus, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1) (2003).

We begin by noting that the appellant failed to include the motion for summary judgment and the response to the motion for summary judgment in the addendum. The appellant's brief shall contain an addendum which shall include "any . . . relevant pleadings, documents, or exhibits essential to an understanding of the case. . . ." Ark. Sup. Ct. R. 4-2(a)(8) (2003).

Rule 4-2(b)(3) provides, in part:

> Whether or not the appellee has called attention to deficiencies in the appellant's abstract or Addendum, the Court may address the question at any time. If the Court finds the abstract or Addendum to be deficient such that the Court cannot reach the merits of the case . . . the Court will notify the appellant that he or she will be afforded an opportunity to cure any deficiencies, and has fifteen days within which to file a substituted abstract, Addendum, and brief. . . .

Ark. Sup. Ct. R. 4-2(b)(3) (2003).

In the present case, the appellant's addendum is deficient as it does not include the summary judgment motion and the response to the summary judgment motion. In order to decide if the trial court properly granted summary judgment, we must be able to determine the specific claims and issues that were presented and resolved by the motions. Although the appellant's addendum

is deficient, since we affirm the trial court's grant of summary judgment on all claims and affirm the trial court's ruling concerning the admissibility of the Rules of Professional Conduct, we find it unnecessary to afford the appellant the opportunity to cure the deficiencies in his addendum. We have stated that we may go to the record to affirm. *Mobley Law Firm, P.A. v. Lisle Law Firm, P.A.*, 353 Ark. 828, 120 S.W.3d 537 (2003); *Hosey v. Burgess*, 319 Ark. 183, 890 S.W.2d 262 (1995).

### Facts

On November 6, 1998, Angela Allen and her sister were killed when the car Mrs. Allen was driving was struck by a train owned by Burlington Northern Railroad. Mrs. Allen was the wife of the appellant. Information provided by eyewitnesses indicated that Mrs. Allen failed to stop at a stop sign and proceeded across the track, even though the train was apparently blowing its whistle and had its lights on.

Approximately two weeks after the accident, Muriel Allison knocked on Mr. Allen's door and was invited in by Mr. Allen and his son. Mr. Allen stated that Allison identified himself as an investigator for Gray & Ritter, a law firm that specializes in railroad cases. In addition, Mr. Allen stated that Allison produced a business card which identified Allison as investigator for Gray & Ritter. While at Mr. Allen's home, Allison showed Mr. Allen pictures of the accident scene, copies of the accident report, and photographs of Mrs. Allen's vehicle. Mr. Allen stated that Allison encouraged him to hire Gray & Ritter to represent him in a suit against Burlington Northern, informing him that he had a "good case" against the railroad company.

Allison told Mr. Allen that if he wanted Gray & Ritter to represent him in a suit against the railroad company, he should contact Pat Merry, an employee of Gray & Ritter's North Little Rock office. Mr. Allen thanked Allison and told him that he was still in too much of a state of shock to consider filing suit. Allison left one of Merry's business cards that identified Merry as "Legal Administrator" for Gray & Ritter. Later that day, Allison telephoned Mr. Allen and encouraged him to hire Gray & Ritter to represent him in a suit against the railroad company. Again, Mr. Allen informed Allison that he was still in too much of a state of shock to consider filing suit.

Sometime in December 1998, Mr. Allen visited his niece — the daughter of his wife's sister who was killed in the accident with

his wife. Mr. Allen's niece told him that she intended to sue the railroad company, and she encouraged Mr. Allen to do the same. Mr. Allen contacted a couple of law firms. One of the law firms declined to represent Mr. Allen because the firm was representing the family of his wife's sister in their action against Mrs. Allen's estate.

In January 1999, Mr. Allen called Merry to discuss possible representation by Gray & Ritter. On January 12, 1999, Merry and Allison visited Mr. Allen at his home. Allen stated that Merry told him that he thought Mr. Allen had a good case against the railroad company. Allen also stated that Merry told him that he thought the case against the railroad company was worth "big bucks." After agreeing to allow Gray & Ritter to represent him, Mr. Allen signed an employment contract Merry carried in with him in a briefcase. Mr. Allen stated that he thought Merry would sign the contract later.

Mr. Allen testified that he thought Merry was a lawyer since his title was "Legal Administrator," so he was surprised when he received a copy of the contract, and it had been signed by attorney George Fitzsimmons rather than Merry. Fitzsimmons is an attorney with Gray & Ritter's St. Louis, Missouri, office.

Pat Hagerty, an attorney with Gray & Ritter, testified that after he received the file on the Allen case, he obtained police reports and photographs from the accident scene. He also stated that he reviewed Arkansas law regarding private crossings, as well as Arkansas law regarding comparative fault. He stated that he obtained general information about Mrs. Allen and notified the railroad company of the firm's intent to represent Mr. Allen. Hagerty also stated that he communicated with Mrs. Allen's niece's attorney. Hagerty testified that he did not hire an investigator to investigate the accident.

In July 1999, Hagerty met with Troy Traylor, an adjuster with Burlington Northern. Though the meeting was set up to discuss a case other than Mr. Allen's, Traylor asked Hagerty if they could discuss the Allen case at the meeting. During the meeting, Traylor told Hagerty that the railroad's investigation revealed that the train's speed was within the legal limits and that the train's lights were on and functioning at the time of the accident. In addition, Traylor told Hagerty that the train was blowing its whistle prior to the accident, though the accident occurred at a private crossing where the railroad was not obligated to blow its

whistle. Traylor told Hagerty that the railroad company was not at fault; however, Traylor stated that since the accident involved a death, the railroad company was prepared to offer a $10,000 settlement without admitting liability.

On July 27, 1999, Hagerty wrote a letter to Mr. Allen informing him of the $10,000 settlement offer. Mr. Allen rejected the offer because he thought it was insulting. Mr. Allen telephoned Hagerty, and Hagerty told Mr. Allen that he might be able to get a little bit more money from the railroad company; however, Hagerty told Mr. Allen that he would likely be unable to get much more because it appeared that the railroad was not at fault.

On November 2, 1999, Hagerty again wrote a letter to Mr. Allen and informed him that if he was unwilling to accept the railroad company's offer, then Gray & Ritter would send Mr. Allen's file back to him and he could find another attorney if he decided to proceed with the lawsuit. Mr. Allen called Hagerty and told him to send the file.

Mr. Allen filed suit against the defendants, now appellees, asserting claims for breach of fiduciary duty, outrage, intentional infliction of emotional distress, fraud, and breach of warranty. Mr. Allen alleged that agents of Gray & Ritter contacted him and represented that they had conducted an investigation of the accident and believed Mr. Allen could recover damages from the railroad for the death of his wife. In addition, Mr. Allen alleged that this contact had taken place within two weeks of his wife's death. Mr. Allen contended that the defendants knew at the time they approached him about filing suit that there was little chance of success in the case, and that the defendants had no intention of pursuing the case vigorously, filing suit, or conducting any further investigation. He alleged that he was insulted and extremely upset by the offer of $10,000, but was further distressed and upset by the defendants' demand that he either accept the offer or they would withdraw from representing him on the case they encouraged him to take.

In pleadings and depositions, Gray & Ritter stated that Allison was not an employee of the firm, and that they did not know how Allison obtained business cards identical to those used by their firm. Allison also stated that he did not know where the cards came from, and that he never identified himself as an investigator for Gray & Ritter. In response to Gray & Ritter's

claim that Allison was not an employee or agent of Gray & Ritter, Mr. Allen amended his complaint to include a claim for civil conspiracy.

The defendants filed a motion for summary judgment on all claims and contended that even if their actions violated the professional rules, they did not give rise to civil liability. On March 1, 2002, the trial court entered an order granting partial summary judgment in favor of the defendants on the claims of outrage, intentional infliction of emotional distress,[1] fraud, and breach of warranty. After further discovery and a renewed motion for summary judgment, the trial court granted summary judgment on the claims of civil conspiracy and breach of fiduciary duty.

On appeal, Mr. Allen argues that the trial court erred in granting summary judgment on his claims of civil conspiracy, breach of fiduciary duty, outrage, fraud, and breach of warranty. He further argues that the trial court erred in ruling inadmissible the Model Rules of Professional Conduct, which Mr. Allen attempted to introduce as proof of civil conspiracy.

*Summary Judgment*

Summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Jackson v. City of Blytheville Civ. Serv. Comm'n*, 345 Ark. 56, 43 S.W.3d 748 (2001). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *George v. Jefferson Hosp. Ass'n, Inc.*, 337 Ark. 206, 987 S.W.2d 710 (1999); *Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998). Our review is not limited to the pleadings, as we also focus on the affidavits and other

---

[1] Mr. Allen does not appeal the trial court's grant of summary judgment on the claim of intentional infliction of emotional distress.

documents filed by the parties. *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998); *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997). After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable persons might reach different conclusions from those undisputed facts. *George, supra.*

### Civil Conspiracy and Admissibility of Model Rules of Professional Conduct

■■ To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive, or immoral means, to the injury of another. *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002). A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy. *Id.* A civil conspiracy is an intentional tort which requires specific intent to accomplish the contemplated wrong. *Id.*

To support his claim of civil conspiracy, Mr. Allen contended that the appellees' direct, in-person solicitation of him within thirty days of his wife's death was a violation of Rule 7.3 of the Arkansas Model Rules of Professional Conduct. Mr. Allen also contended that Rule 7.1 was violated by the allegedly false statements made to solicit him as a client. The appellees filed a motion in limine to exclude any reference to the Rules, and the trial court granted their motion.

■■ The trial court makes the determination as to the admissibility of testimony. *Orsini v. Larry Moyer Trucking, Inc.*, 310 Ark. 179, 883 S.W.2d 366 (1992). The trial court must determine the relevancy, competency, and probative value of the testimony. *Id.* The admissibility of testimony is within the trial court's discretion, and the trial court will not be reversed absent an abuse of that discretion. *See id.* In *Orsini*, a trucking company brought a legal malpractice action against its attorney and attempted to introduce the Model Rules of Professional Conduct as evidence. The trial court refused the introduction of the Rules, and we found no error, stating:

> The Rules are not designed for a basis of civil liability, but are to provide guidance to lawyers and to provide a structure for regula-

tory conduct through disciplinary agencies. No cause of action should arise from a violation, nor should it create any presumption that a legal duty has been breached.

*Orsini*, 310 Ark. at 184–184A (citing "Scope," Model Rules of Professional Conduct, by per curiam order of Supreme Court of December 16, 1985).

Mr. Allen contends that his case is distinguishable from *Orsini*, in that *Orsini* was a legal malpractice case in which the Rules were being offered to prove standard of care. Mr. Allen states that he is attempting to use the Rules to prove an element of the civil conspiracy, but he claims that the violation of the Rules, in and of itself, is not being used to establish civil liability. However, Mr. Allen concedes that without the violation of the Rules, he cannot show that the purpose of the appellees was unlawful. Therefore, Mr. Allen is attempting to use the violation of the Rules as a basis for civil liability. As previously stated, the Rules are not designed for a basis of civil liability. *Orsini, supra*. The trial court did not abuse its discretion in refusing the admission of testimony concerning the Model Rules of Professional Conduct.

Additionally, Mr. Allen argues that "prohibiting introduction of the rules violates equal protection," in that the exclusion of the Rules exempts attorneys from civil conspiracy cases. Mr. Allen offers no support for this proposition. Where no citation to authority or convincing argument is offered, we decline to address the issue on appeal. *Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002).

Finally, Mr. Allen argues that even without evidence of a violation of the Rules, there is a jury question concerning whether the appellees' actions constituted oppressive conduct. However, Mr. Allen failed to raise this issue below. An appellant may not change the basis for his or her arguments or raise issues for the first time on appeal. *T & T Chem., Inc. v. Priest*, 351 Ark. 537, 95 S.W.3d 750 (2003). Because Mr. Allen failed to properly preserve his "jury question" argument, we do not consider it on appeal. We affirm the trial court's grant of summary judgment on the claim of civil conspiracy.

### Breach of Fiduciary Duty

Mr. Allen contends that the appellees breached their fiduciary duty when they approached him and told him that they had

already investigated the case, that they had already determined that the case was a good case of liability, and that the case was worth "big bucks." Mr. Allen contends that the purpose of the appellees' statements was to induce him to sign an employment contract, and that the appellees' statements were not made in good faith. He further contends that although it was the appellees' duty to pursue the case with the "utmost care and investigation," after the appellees "enticed" him to sign the employment contract, they conducted no further investigation of his case and failed to interview an eyewitness to the accident. According to Mr. Allen, the appellees induced him to sign an employment contract for the "sole purpose of settling for a nuisance value or whatever the railroad would offer and to collect an attorney fee."

The question as to what duty is owed is always a question of law. *Cherepski v. Walker*, 323 Ark. 43, 913 S.W.2d 761 (1996). *See also Sexton Law Firm, P.A. v. Milligan*, 329 Ark. 285, 948 S.W.2d 388 (1997). A person standing in a fiduciary relationship may be held liable for any conduct that breaches a duty imposed by the fiduciary relationship. *Cole v. Laws*, 349 Ark. 177, 76 S.W.3d 878 (2002); *Milligan, supra*. It follows that regardless of the express terms of an agreement, a fiduciary may be held liable for conduct that does not meet the requisite standards of fair dealing, good faith, honesty, and loyalty. *Cole, supra; Milligan, supra*. A fiduciary relationship exists between attorney and client, and the confidence which the relationship begets between the parties makes it necessary for the attorney to act in utmost good faith. *American-Canadian Oil & Drilling Corp. v. Aldridge & Stroud, Inc.*, 237 Ark. 407, 373 S.W.2d 148 (1963) (citing *Norfleet v. Stewart*, 180 Ark. 161, 20 S.W.2d 868 (1929)).

Mr. Allen concedes that his case is different from other cases involving an attorney's breach of fiduciary duty to a client, in that, in his case, the alleged breach of fiduciary duty occurred *before* he entered into an attorney–client relationship with the appellees. However, Mr. Allen contends that "[b]ecause the relationship was procured by Gray & Ritter through misrepresentations by Allison . . . the fiduciary duty should be ruled by this Court to have merged with the signing of the contract so that the fiduciary duty began with the solicitation and misrepresentations." We first note that Mr. Allen offers no citation to authority for the proposition that an attorney owes a fiduciary duty to a client prior to the existence of an attorney–client relationship. Assignments of

error which are unsupported by convincing argument or authority will not be considered on appeal unless it is apparent without further research that they are well taken. *Webb v. Bouton*, 350 Ark. 254, 85 S.W.3d 885 (2002).

Moreover, in Mr. Allen's response to the appellees' motion for summary judgment, he did not argue that the fiduciary duty "merged" with the signing of the contract so that the duty began when the appellees first contacted him. Rather, he argued that "at the very least, there is a factual question as to whether a fiduciary duty existed, when it arose, and whether it was breached by the defendant." An appellant may not change the basis for his or her arguments or raise issues for the first time on appeal. *T & T Chem., supra.*

Alternatively, Mr. Allen argues that the appellees breached their fiduciary duty when they did not, upon signing the contract, reveal to him that they had made misrepresentations concerning his case. Mr. Allen did not raise this argument below; therefore, we will not address it for the first time on appeal. *T & T Chem., supra.* We affirm the trial court's grant of summary judgment on the claim of breach of fiduciary duty.

## Outrage

To establish an outrage claim, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Crockett v. Essex*, 341 Ark. 558, 19 S.W.3d 585 (2000); *Angle, supra.*

In *Crockett*, we further stated:

> The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Hollomon v. Keadle,* 326 Ark. 168, 931 S.W.2d 413 (1996). This court gives a narrow view to the tort of outrage, and requires clear-cut proof to establish the elements in outrage cases. *Croom v. Younts,* 323 Ark. 95, 913 S.W.2d 283 (1996). Merely describing the conduct as outrageous does not make it so. *Renfro v. Adkins,* 323 Ark. 288, 914 S.W.2d 306 (1996).

*Crockett*, 341 Ark. at 564 (citing *McQuay v. Guntharp*, 331 Ark. 466, 470-71, 963 S.W.2d 583, 585 (1998)).

In addition, this court has recognized that in some cases the existence of a special relationship between the parties can justify a finding of outrage where "the gist of the claim arose out of the violation of that relationship. . . ." *McQuay v. Guntharp,* 331 Ark. at 474. Mr. Allen contends that the attorney-client relationship is a "special relationship," and that the appellees "violated the attorney-client relationship in such a way that the tort of outrage should be allowed to be tried."

In *McQuay*, female patients alleged that a physician improperly touched, examined, and fondled their breasts during physical examinations, and that as a result of the trauma, they have suffered and continue to suffer from extreme mental anguish. We agreed with the female patients' contention that it was not the fondling itself that gave rise to a claim of outrage, but in the physician's violation of the trust the women had placed in him.

In *Crockett, supra*, the family of a decedent brought suit against a funeral home and funeral director, alleging, *inter alia*, a claim of outrage. In that case, the family alleged that the burial service and burial orchestrated by the funeral home was conducted in a harried manner, that the hearse was driven too fast to the grave, that a disabled family member was taken by car over the graves of unknown persons, and that the funeral director talked on his cellular phone for an extended period of time during the funeral. We stated that while the conduct "may have been rude and illustrative of a lack of professionalism, we cannot say that the conduct was so extreme and outrageous as to be beyond all possible bounds of decency, and to be utterly intolerable in a civilized society." *Crockett*, 341 Ark. at 566.

Mr. Allen argues that he presented evidence that:

> Allison, at the behest and request of Pat Merry and Gray & Ritter, P.C. hunted down Mr. Allen and encouraged him to undertake a lawsuit, which he would not ordinarily have done, pumping him by stating that it was a good suit and would make him big bucks. But they did this while either having no knowledge as to whether it was a good suit worth money, or knowing in fact that it was not a good suit. He placed his trust in the law firm, and their response was to field one offer, and then send his file back when he refused to settle the case they had solicited and encouraged him to undertake. This

is a breach of the relationship under *McQuay*, and established a cause of action for the tort of outrage . . . . .

■ We disagree. While the conduct of the appellees may have been unprofessional and insensitive, we cannot say that the conduct was so extreme and outrageous as to be beyond all possible bounds of decency, and to be utterly intolerable in a civilized society. We believe that the alleged conduct in this case comes closer to the actions in *Crockett, supra*, than those in *McQuay, supra*. As we stated in *Crockett*:

> We do acknowledge that family members of a deceased person are understandably more sensitive and vulnerable following the death of a close relative, rendering them more susceptible to outrageous conduct. But the facts asserted in this case simply cannot support an action for outrage.

*Crockett*, 341 Ark. at 566. We affirm the trial court's grant of summary judgment on the claim of outrage.

### Fraud

■ To establish a claim of fraud, a plaintiff must prove the existence of the following five elements: (1) a false representation, usually of a material fact; (2) knowledge or belief by the defendant that the representation is false; (3) intent to induce reliance on the part of the plaintiff; (4) justifiable reliance by the plaintiff; and (5) resulting damage to the plaintiff. *Wiseman v. Batchelor*, 315 Ark. 85, 88-89, 864 S.W.2d 248, 250 (1993).

In his brief, Allen states that "[t]he material fact which was falsely represented occurred with Gray & Ritter's first contact with Allen through Muriel Allison." He states that Allen's false representations are: (1) that Gray & Ritter had already completed a proper investigation; (2) Gray & Ritter had already determined from that investigation that this was a good case of liability; (3) that Gray & Ritter had already determined that the case was worth "big bucks" if Allen hired Gray & Ritter; and (4) that Allison was an "investigator" for a law firm which could make such a determination.

Allen contends that the appellees knew that the case had not been investigated. He also contends that he was approached by Allison, "who had a business card and held himself out to be an

expert in railroad accident investigation working for a law firm that was an expert in railroad litigation, and was told he had a good case." Allen argues that he "had every reason to rely on their opinion," and that he would never have filed suit if it had not been for the assurance of Allison and Merry that he had a case. Finally, Allen states: "The damages to Allen are the increase in his mental suffering and depression caused by this entire incident."

 Damages for mental anguish due to fraud are not cognizable in Arkansas.[2] *See Higginbottom v. Waugh*, 313 Ark. 558, 560-61, 856 S.W.2d 7, 9 (1993). *See also Gilmer v. Walt Disney Co.*, 915 F. Supp. 1001, 1011 (W.D. Ark. 1996); Howard Brill, *Arkansas Law of Damages* § 4-7 (4th ed. 2002). There is no legal basis for the damages Mr. Allen claims to have suffered; thus, Mr. Allen has failed to prove the existence of an essential element of fraud: damages suffered as a result of the reliance. If a respondent to a motion for summary judgment cannot present proof of an essential element of the claim, the movant is entitled to summary judgment as a matter of law. *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 33 S.W.3d 128 (2000). We affirm the trial court's grant of summary judgment on the claim of fraud.

### Breach of Warranty

Mr. Allen contends that the trial court erred in granting summary judgment on his claim for breach of warranty. To support his claim of breach of warranty, Mr. Allen cites *Schmidt v. Pearson, Evans, and Chadwick*, 326 Ark. 499, 931 S.W.2d 774 (1996), where this court held that an attorney is not a guarantor that his or her judgment is infallible and is not liable for an error made in good faith. Mr. Allen claims that the appellees' errors were not made in good faith. He claims that when Gray & Ritter presented its request to be hired, through Allison, the firm repre-

---

[2] We note that in *Higginbottom*, we stated: "We recognize no legal basis for the damages claimed for mental anguish in connection with *deceit*." 313 Ark. at 560 (emphasis added). We have not expressly stated that damages for mental anguish due to *fraud* are not cognizable in Arkansas. However, research of our case law shows that we have stated that the tort of deceit is also known as the tort of fraud. *See Calandro v. Parkerson*, 327 Ark. 131, 137, 936 S.W.2d 755, 759 (1997). In addition, we have made no distinction between the claim of fraud and the claim of deceit, in that the elements for proving either fraud or deceit are the same. *See, e.g., Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002); *Goforth v. Smith*, 338 Ark. 65, 991 S.W.2d 579 (1999); *Butler v. Comic*, 323 Ark. 725, 918 S.W.2d 697 (1996).

sented to Mr. Allen that Mr. Allison had conducted an investigation and that he had a "good case" worth "big bucks." Mr. Allen states that "[w]hen an employment contract is entered upon this basis, a lawyer is warranting a result."

The *Schmidt* case was a legal malpractice case, not a breach of warranty case. The appellees contend that there is no case that supports a cause of action for a cause of action for attorney-client breach of warranty. It appears that the appellees are correct; therefore, the issue of whether Arkansas recognizes a cause of action for attorney-client breach of warranty is an issue of first impression.

The appellees cite to a South Carolina case, *Holy Loch Distributors v. Hitchcock*, 340 S.C. 20, 531 S.E.2d 282 (2000), in which the South Carolina Supreme Court, declining to adopt a breach of express warranty claim, stated:

> [T]he breach of express warranty theory would change the current standard of care for attorneys. Attorneys would be held strictly liable for failing to satisfy the alleged warranty, no matter how much care, skill, knowledge, and diligence was exercised in attempt to achieve the result. An express warranty cause of action would also adversely affect the attorney-client relationship by inhibiting the frank discussion between attorney and client concerning the merits of the case. The fear of an express warranty claim would discourage attorneys from advising clients of the potential for victory in their case because this advice might be construed as a guarantee or a warranty.

*Holy Loch*, 340 S.C. at 27; 531 S.E.2d at 287. Further, the *Holy Loch* court noted that Louisiana is the only state which recognizes a breach of express warranty to obtain a specific result against an attorney. *Id.*

■ We conclude that the reasoning of the *Holy Loch* court is sound. Accordingly, we hold that there is no cause of action in Arkansas for breach of warranty to obtain a specific result when an attorney advises his or her client regarding the outcome of a case. The trial court's grant of summary judgment on the claim of breach of warranty is affirmed.

In sum, we affirm the trial court's grant of summary judgment for the appellees on the claims of civil conspiracy, breach of fiduciary duty, outrage, fraud, and breach of warranty. We also affirm the trial court's ruling that the Arkansas Model Rules of Professional Conduct are inadmissible in this case. Finally, given

that the circumstances of this case involve allegations of violations of professional rules concerning direct, in-person solicitation of clients, a copy of this opinion will be forwarded to the Committee on Professional Conduct.

Affirmed.

GLAZE, J., concurs.

TOM GLAZE, Justice, concuring. I concur in the result reached in this case, but add the caveat that, if a law firm is going to utilize investigators or runners to solicit business, that firm should be ready to defend that person's conduct and alleged misrepresentations when he or she approaches an injured person who is targeted as a potential client. This case depicts the problems that can arise when third parties are used to contact possible clients. If Mr. Allen could have shown he had suffered damages, I would have dissented in this case.