Jerry ADAMS; Orville Beavers and Mary Beavers; Phyllis
Dexter; Patricia Foshee and Carl Foshee; Deborah Ann Johnson
and John Johnson; Darlene and Eddie Kinder; Ludivinia
Gallegos Miller; Kenneth Mitchell and Jan Mitchell; Sheila
Orrell and Tommy Orrell; Carl Rae and Priscilla Rae; Randy
Stewart and Deondra Stewart; David Trusty and Pam Trusty *v.*
James ARTHUR, M.D.; Allan Gocio, M.D.; Hot Springs
Neurosurgery Clinic, P.A.; American Medical International,
Inc., d/b/a National Park Medical Center; St. Joseph's Regional
Health Center, Inc.

96–1350; 96–1470; 96–1415; 969 S.W.2d 598
96–1407; 96–1355; 96–1354;
96–1414; 96–1406; 96–1409;
96–1408; 96–1405; 96–1365

Supreme Court of Arkansas
Opinion delivered April 30, 1998
[Petitions for rehearing denied June 11, 1998.*]

* 96–1350; 96–1355; 96–1406.

58

*Boswell, Tucker, Brewster & Hicks*, by: *George R. Wise, Jr.*, for appellants Jerry Adams; Orville Beavers and Mary Beavers; Phyllis Dexter; Patricia Foshee and Carl Foshee; Deborah Ann Johnson and John Johnson; Darlene and Eddie Kinder; Ludivinia Gallegos Miller; Kenneth Mitchell and Jan Mitchell; Shiela Orrell and Tommy Orrell; Carl Rae and Priscilla Rae; Randy Stewart and Deondra Stewart; David Trusty and Pam Trusty.

*Friday, Eldredge & Clark*, by: *J. Phillip Malcom* and *Tonia P. Jones*, for appellees James Arthur, M.D.; Allan Gocio, M.D.; Hot Springs Neurosurgery Clinic, P. A.

*Huckabay, Munson, Rowlett & Tilley, P.A.*, by: *Mike Huckabay* and *Beverly A. Rowlett*, for appellee American Medical International, Inc., d/b/a National Park Medical Center in cases 96-1350, 96-1470, and 96-1405.

*Wright, Lindsey & Jennings*, by: *Edwin L. Lowther, Jr.*, and *Don S. McKinney*, for appellee St. Joseph's Regional Health Center, Inc., in cases 96-1415, 96-1407, 96-1355, 96-1354, 96-1414, 96-1406, 96-1409, 96-1408, and 96-1365.

ANNABELLE CLINTON IMBER, Justice. These twelve cases involve identical core issues. By agreement of the parties, the cases were orally argued and submitted simultaneously. In the interest of efficiency, we dispose of them in a single opinion. All appellants were patients (or their spouses) of the appellee doctors, Drs. James Arthur and Allan Gocio. The appellants underwent anterior cervical fusion surgeries. In performing the surgeries, the doctors used hydroxylapatite, known by the trade name "Orthoblock," as a spacer in the spine.

Following their respective surgeries, appellants filed complaints against the doctors and their clinic, Hot Springs Neurosurgery Clinic, P.A (the "doctors"), alleging that they were damaged as a result of the implantation of Orthoblock. In each case the complaint was filed more than two years after the respective surgery. Appellants sought recovery based on negligence, battery, fraud, outrage, strict liability, and breach of warranty. The hospitals where the surgeries were performed were also named as defendants. In three cases, the hospital was American Medical International, Inc. ("AMI"), while in the remaining nine cases the hospital was St. Joseph's Regional Health Center, Inc. ("St. Joseph's"). The manufacturer of Orthoblock, Calcitek, Inc., was also named as a defendant in all twelve cases.

The doctors and the hospitals moved for summary judgment in part arguing that all claims were barred by the limitations period found in the Arkansas Medical Malpractice Act. The trial court agreed and granted summary judgment to the doctors and hospitals finding that all claims were barred by the two-year limitations period for medical injury found in the Medical Malpractice Act, Ark. Code Ann. § 16-114-203(a) (Supp. 1997). The trial court additionally declined to find that the Medical Malpractice Act was unconstitutional. While Calcitek did not join in these motions for summary judgment, orders of dismissal were entered in these cases reflecting a settlement with Calcitek. The present appeals fol-

lowed. We affirm the grant of summary judgment in favor of the appellee doctors in *Adams*, No. 96-1350, *Johnson*, No. 96-1355, *Mitchell*, No. 96-1406, and reverse and remand as to the appellee doctors in *Stewart*, No. 96-1405, *Foshee*, No. 96-1407, *Rae*, No. 96-1408, *Orrell*, No. 96-1409, *Miller*, No. 96-1414, *Dexter*, No. 96-1415, *Trusty*, No. 96-1365, *Kinder*, No. 96-1354, and *Beavers*, No. 96-1470. As to the appellee hospitals, we affirm the grant of summary judgment in all cases.

## I. Fraudulent Concealment.

The appellants argue that the grant of summary judgment to the doctors and hospitals was erroneous because genuine issues of material fact existed as to whether fraud or fraudulent concealment tolled the limitations periods in each case. The law is well settled that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *Wallace v. Broyles*, 331 Ark. 58, 961 S.W.2d 712 (1998), *supp. opinion on denial of reh'g*, 332 Ark. 189, 961 S.W.2d 712 (1998). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.* We have further explained that:

> We have ceased referring to summary judgment as [a] "drastic" remedy. We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, i.e., when there is not any genuine remaining issue of material

fact and the moving party is entitled to judgment as a matter of law.

*Id.*

When the running of the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading this defense. *First Pyramid Life Ins. Co. v. Stoltz*, 311 Ark. 313, 843 S.W.2d 842 (1992), *cert. denied*, 510 U.S. 908 (1993). However, once it is clear from the face of the complaint that the action is barred by the applicable limitations period, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled. *Id.* Fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *First Pyramid, supra.* Although the question of fraudulent concealment is normally a question of fact that is not suited for summary judgment, when the evidence leaves no room for a reasonable difference of opinion, a trial court may resolve fact issues as a matter of law. *Alexander v. Flake*, 322 Ark. 239, 910 S.W.2d 190 (1995).

*A. Appellee Doctors.*

In support of their fraudulent-concealment argument, the appellants primarily rely on *Howard v. Northwest Arkansas Surgical Clinic, P.A.*, 324 Ark. 375, 921 S.W.2d 596 (1996). In *Howard*, this court explicitly rejected the notion that any time a foreign object was left by a physician in a patient, the only exception to the two-year limitations period was the one year from discovery provision contained in Ark. Code Ann. § 16-114-203(b) (1987). Rather, we had recognized in past foreign-object cases that proof of knowing concealment was not always necessary to establish fraudulent concealment. *Howard, supra* (citing *Faulkner v. Huie*, 205 Ark. 332, 168 S.W.2d 839 (1943) and *Burton v. Tribble*, 189 Ark. 58, 70 S.W.2d 503 (1934)).

The appellant in *Howard* had come forward with some evidence to support concealment of the fact that her treating physician had allowed the tip of a needle to remain in the patient's body

with knowledge that it was there. Thus, the appellant's treating physician was not entitled to summary judgment based on the statute of limitations. "In the case now before us there is an allegation of an act perpetrated in a way that it conceals itself. We have a defendant who had an obvious professional, positive duty to speak if he knew he had negligently left a foreign object in his patient, we have evidence that he was informed that the foreign object remained in the patient, and we have a plaintiff who could not, if the facts were as stated, have detected the fraud." *Howard, supra.* We emphasized that the General Assembly, in enacting the Medical Malpractice Act, could not have intended to allow physicians to avoid responsibility for negligent acts by knowingly concealing them from patients. By contrast, the radiologist who examined the tissue, and who had noted in her report to the treating physician that she had not seen the barbed tip of the needle in the tissue sample, was entitled to summary judgment as the appellant had not come forward with evidence to counter the radiologist's affidavit that she did nothing to conceal the fact that an object was left in the appellant.

The doctors in turn emphasize *Norris v. Bakker*, 320 Ark. 629, 899 S.W.2d 70 (1995), another case where a physician's patient claimed that fraudulent concealment had tolled the limitations period on her causes of action. The patient in *Norris* alleged that her dentist had examined her breast under the pretense of a lymph node examination. While her complaint was filed outside of the limitations period, she argued that the dentist's act was something so furtively planned and secretly executed so as to keep her cause of action concealed from her because she lacked the essential medical knowledge to realize that the touching was not a necessary part of the examination. She also alleged that the dentist had a duty to inform her of the injury inflicted upon her in light of the physician-patient relationship.

We affirmed the grant of summary judgment in favor of the dentist, given that the patient had failed to meet proof with proof to show that there was a genuine issue of material fact. In doing so, we emphasized the so-called "classic language" regarding fraudulent concealment:

> No mere ignorance on the part of the plaintiff of his rights, nor the mere silence of one who is under no obligation to speak, will prevent the statute bar. There must be some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself. And if the plaintiff, by reasonable diligence, might have detected the fraud, he is presumed to have had reasonable knowledge of it. *Id.*

*Id.* (quoting *Wilson v. GECAL,* 311 Ark. 84, 841 S.W.2d 619 (1992)). In *Norris*, the patient simply failed to show how her dentist prevented her from learning that his representation was false.

■ At the outset, we must reject the appellants' contention that in all informed-consent cases, there will always be genuine issues of material fact as to fraudulent concealment. The appellants assert in their reply briefs that "within the context of informed consent, fraudulent concealment will always occur when the evidence indicates that facts important to the Plaintiff's decision to undergo a particular treatment were fraudulently withheld, as in this case, from the plaintiff patient." While the appellants cite us to jurisdictions that might appear to go this far, we are unwilling to accept such a formulation of fraudulent concealment that would effectively eviscerate the two-year limitations period in all informed-consent cases. The Medical Malpractice Act establishes a two-year limitations period for medical injury, Ark. Code Ann. § 16-114-203(a), contemplates actions for lack of informed consent, *see* Ark. Code Ann. § 16-114-206(b)(1), and yet does not carve out an exception to the limitations period in informed-consent cases. Appellants' contention ignores the above-quoted "classic language" regarding fraudulent concealment and in fact obliterates any distinction between nondisclosure and fraudulent concealment in claims involving failure to obtain informed consent. To equate an alleged breach of a physician's duty to obtain a valid informed consent with a fact question as to fraudulent concealment would effectively destroy the limitations period that begins running from the moment of medical injury.

Here we are not concerned with the merits of the appellants' underlying claims, but instead we address whether their respective complaints were timely filed. In this regard, *Trantafello v. Medical*

*Ctr. of Taranza*, 227 Cal. Rptr. 84 (Cal. Dist. Ct. App. 1986) provides us with useful guidance. In *Trantafello* the plaintiff brought a medical malpractice action alleging that his surgeon had performed a surgical discectomy and had used a piece of an acrylic substance, methyl methacrylate, as a spacer in the spine where the disc was removed. The theory of the plaintiff's case was that the generally accepted practice in disc surgery was to implant a bone graft, and that the use of methyl methacrylate was an innovative procedure not generally accepted in the United States because of a high probability that it would not fuse or heal properly and which had a high incidence of pseudo arthrosis. The plaintiff alleged that prior to the surgery, the surgeon did not advise him that he intended to use methyl methacrylate instead of a bone graft, nor of the innovative nature and risks of the procedure.

The plaintiff in *Trantafello* filed outside of the applicable limitations period under California law, but claimed that the limitations period should have been tolled by the defendants' intentional concealment. However, the *Trantafello* court emphasized that intentional concealment had to be something more than a mere continuation of the prior nondisclosure. While the opinion of the plaintiff's expert raised a factual issue as to whether the defendant's procedure was innovative, and whether the defendant was required to advise the plaintiff prior to obtaining the plaintiff's consent of the innovative nature of the operation and the available options and dangers involved, "[i]ntentional concealment is something more than a lack of informed consent. It would have to have occurred either at or subsequent to the time that the medical procedure was undertaken." *Id.* Moreover, the plaintiff failed to show any issue as to an affirmative misrepresentation, as "[p]laintiff conceded in his deposition that [defendant] never told him anything false about the surgery."[1] *Id.*

 In the present cases, we certainly agree that evidence of affirmative misrepresentations, either in connection with or subsequent to the appellants' surgeries, may create a fact question of

---

[1] In a footnote, the *Trantafello* court alluded to an alleged misrepresentation made by the defendant given his reference to "bone" rather than methyl methacrylate. However, this alleged statement was irrelevant for tolling purposes given that it had allegedly occurred after the three-year limitations period had expired.

tolling the limitations period for the jury. However, fraudulent concealment must go beyond a mere failure to obtain an adequate informed consent; it must rise to the level of "some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." *See Norris, supra.* Here, we note that *Howard, supra,* was a decision based on a foreign-object claim. The physician there had a duty to speak because he negligently left a foreign object in the patient, and there was evidence that the physician knew the foreign object was left in the patient. Such is not the case here, where these appellants knew that they were undergoing neck surgery requiring the implantation of some material — either real bone or some synthetic material.

Another case that bears mentioning is *Roberts v. Francis,* 128 F.3d 647 (8th Cir. 1997). In *Roberts* the Eighth Circuit, interpreting Arkansas law, extended *Howard* beyond the realm of foreign objects to a case where the patient, who had her bladder removed to repair severe urological problems, also had her only remaining ovary removed without explanation. Basing its holding on the "special nature of the doctor-patient relationship," the *Roberts* court held that the physician was under a duty to inform the patient that he had removed her only remaining ovary — creating a fact question as to fraudulent concealment. However, the fact situation presented in *Roberts,* where the patient consented to a urological surgery that resulted in the removal of her ovary without explanation, is much more like the *Howard* scenario than the present cases. The appellants here consented to neck surgery involving an implantation, which surgery they received, and the heart of these cases is whether or not that consent was informed. To simply say that in every informed-consent case the "physician maintain[ed] primary control over the relevant information and the plaintiff [was] unaware of the alleged wrong," *see Roberts, supra, ergo* a fact question exists as to fraudulent concealment, is to do damage to the General Assembly's expression of public policy as embodied in the two-year limitations period.

At the same time, we reject an interpretation of *Norris* that would foreclose a patient's ability to establish a fact question as to

fraudulent concealment in all informed-consent cases involving alleged affirmative misrepresentations by the physician. While there is language in *Norris* that may be taken to that effect, "[appellant] failed to show how [appellee] prevented her from learning that his representation was false[,]" such an interpretation would lead to absurd results. It is easy to understand this quoted language based on the facts in *Norris*, where a dentist touched the patient's breast under the pretense of a lymph node examination. *See also Howard, supra* (patient in *Norris* "knew the act had occurred"); *Roberts, supra* (describing the patient in *Norris* as "simply ignorant of her rights").

Obviously, an affirmative misrepresentation by a physician in connection with or after the surgery may operate to conceal the patient's cause of action. *See Jones v. Central Ark. Radiation Therapy Institute, Inc.*, 270 Ark. 988, 607 S.W.2d 334 (1980) (physician's representation concerning the uncertainty about the cause of plaintiffs' condition following medical injury and subsequent and purposeful dilatory conduct "cover[ed] up its fraudulent character and prevent[ed] plaintiff from seeing another doctor. But for this fraud, [the plaintiff] could have discovered the alleged malpractice before the statute of limitations ran.") To hold otherwise would necessarily foster an environment of complete distrust between patient and physician. Such a consequence could not have been intended by the General Assembly in enacting the two-year limitations period.

To the extent that there is evidence that the doctors' alleged omissions or misrepresentations resulted in a surgery performed without an adequate informed consent, this obviously goes to the merits of appellants' claims. However, in examining whether appellants' complaints were timely filed, we reiterate that we do not simply equate evidence of a breach of the duty to obtain informed consent with a fact question as to fraudulent concealment. There must be something more than a continuation of a prior nondisclosure. Rather, there must be evidence creating a fact question as to "some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." *See Norris, supra.* Finally, we must be mindful that an allegation of fraudulent concealment is not typically well-suited for summary

judgment, unless the evidence leaves no room for a reasonable difference of opinion. *See O'Mara v. Dykema*, 328 Ark. 310, 942 S.W.2d 854 (1997); *Chalmers v. Toyota Motor Sales*, 326 Ark. 895, 935 S.W.2d 258 (1996). Bearing these principles in mind, we now turn to the proof submitted in these cases as abstracted.

> *1. Jerry Adams, No. 96-1350; Randy Stewart and Deondra Stewart, No. 96-1405; Orville Beavers and Mary Beavers, No. 96-1470.*

The evidence submitted by the various appellants in response to the appellees' motions for summary judgment, including that which is abstracted, is not completely identical. In the three cases where AMI was named as a defendant, *Adams*, No. 96-1350, *Stewart*, No. 96-1405, and *Beavers*, No. 96-1470, the appellants submitted the same exhibits except for portions of the appellants' affidavits. Deposition testimony from Dr. Arthur established that Orthoblock had not been approved by the FDA for use in the human spine. Arthur also acknowledged that the long-term effects of the Orthoblock regarding such uses were not yet known. David Gassier opined in deposition testimony that he lacked sufficient data to give an opinion as a scientist as to whether hydroxylapatite could withstand the forces of the human spine "based solely upon this one article."

Use in the human spine was not an indicated use on the package insert that accompanied Orthoblock. A "contraindication" was that Orthoblocks should not be used where they would likely sustain significant tensile, flexural or shear forces. In answers to interrogatories, AMI contended that Arthur never sought specific approval of any hospital committee with respect to the use of Orthoblocks in cervical fusions, and that Arthur never informed it of such use. Once AMI became aware of the filing of "this lawsuit," it had not used or ordered Orthoblocks. A "Conditions of Admission" is abstracted to show the "Financial Agreement" between the patient and the hospital.

Arthur reported to Calcitek that he had very few fractures with Orthoblock, although Gocio had experienced a fracture rate of about 50%. Arthur attributed the higher rate to the force that

Gocio used in tapping the Orthoblock into place. In a letter dated March 29, 1991, a Dr. Lawrence from the University of Marshall of San Diego informed Calcitek that he consecutively had two Orthoblocks fracture, causing him to express concern about the viability of Orthoblock. A Calcitek invoice to AMI, dated July 24, 1992, showed two separate quantities of Orthoblock, seven A-6, and three A-8, billed at $150 a unit.

A St. Joseph's "Product Return Receipt" dated April 5, 1991, explained that a "block broke off during surgery. No pressure [illegible] drills used according to OR. Credit on arrival please." An internal Calcitek complaint evaluation memo dated June 28, 1991, regarding the St. Joseph's complaint, resulted in the discovery that Orthoblock was used in an anterior cervical discectomy procedure. The block was tamped using a metal tool directly against the block. The memo further explains that Orthoblocks are not designed to withstand contact with metal tools. Calcitek sent Arthur and Gocio Custom Device Agreements in order to continue use of Orthoblocks in their practices. Custom seating tools had also been provided to assist them in placement of Orthoblock without using metal tools.

The appellants in all twelve cases submitted affidavits. These affidavits identify the following as a partial list of facts that "were never disclosed to me by Arthur, Gocio, the hospital, or anyone else prior to my surgery. Had these facts been disclosed to me, I would not have allowed the surgery to be performed with the product known by the tradename Orthoblock:"

> — That he had experienced fractures with the product Orthoblock in other patients.
> — That the product Orthoblock was not FDA approved for use in human spines.
> — That the product Orthoblock was not designed by the manufacturer for use in human spines.
> — That the package insert that came with the product indicated that it was not designed for use in applications where it would undergo significant flexural, tensile, or sheer forces. These forces, of course, describe the types of movements and stresses that are in the spine.

— That the use of the product Orthoblock in the human spine was experimental.

— That the hospital's institutional review board that is charged with the review of such procedures had not reviewed or approved the use of the product Orthoblock in the spine.

— That Dr. Arthur had only reviewed one article and discussed the use of the material known as Orthoblock with a dentist to determine whether it was safe for use in the spine. He did not tell me that the professional review at the end of that one article he had read called for more study before this product was used in the human spine.

— That prior tests performed by the manufacturer with this material on mongrel dogs indicated that the material used in the product Orthoblock was not appropriate for use in the spine.

— That dense hydroxylapatite, a ceramic material from which the product Orthoblock is composed, is more brittle than bone.

— That bone will not grow into or through this product as it will with bone taken from a patient's own body or bone that is donated for this purpose. I was not told, that, at best, this material will only act as a "spacer." I was not told that this procedure using the product Orthoblock was not the normal and customary material used in the anterior cervical fusion procedure.

— That there was a risk of fracture of the ceramic material known as Orthoblock.

— That if the product Orthoblock fractured, I would have to undergo another surgery.

— That neither Dr. Arthur nor Dr. Gocio had ever discussed the use of product Orthoblock with any other doctor who had experience using it in the human spine to determine whether it was safe or how it could be used.

— That I was not subsequently advised that Gocio or Arthur had to sign a "custom device agreement," a document acknowledging that the product Orthoblock was not designed for use in the spine and requiring them to make assurance that patients were aware of this fact and obtain from them their informed consent before the material was used, to be able to purchase and use the product known as Orthoblock.

— That he did not tell me that he had subsequently signed an agreement with the manufacturer of the product to keep secret the information he had regarding the development of this product for use in the human spine.

— That the manufacturer had not included in its application to the FDA to market the product Orthoblock a request for permission to promote them for use in the spine.

— That other patients had the product fail resulting in fractures of the ceramic material.

— That other patients, after implementation of the product Orthoblock, continued to experience, among other problems, arm pain, shoulder pain, neck pain, arm and hand numbness, and severe, frequent headaches.

— That other patients, after implantation of the product Orthoblock, had experienced a sensation of having difficulty swallowing.

— That he did not know or have a basis for knowing the long term [e]ffect of the product's use in the human spine.

Finally, the appellants' affidavits also contain statements that are unique to each case.

###### a. Jerry Adams, No. 96-1350.

In his affidavit, Adams stated that on March 8, 1990, Dr. Arthur, assisted by Dr. Gocio, performed the surgery on his neck. Adams filed his complaint on March 31, 1993. Prior to his surgery, he had met with Dr. Arthur to discuss the procedure. Adams had assumed that bone from his hip would be used, since bone from his hip was used in his last surgery. Dr. Arthur did not disclose to Adams that he was going to use Orthoblock in his surgery. The day after the surgery, Adams recognized that he had no incision on his hip. At his first office visit with Dr. Arthur, he asked him about this. Dr. Arthur showed him an x-ray, which revealed the Orthoblock. Dr. Arthur explained that this was a manmade material, made in England, and that it had the texture of a tennis shoe. He further stated that he had not had any slip and had not had any other problems with an Orthoblock. He additionally said that the Orthoblock had small holes that allowed it to fuse with bone.

This evidence does raise a factual issue as to whether the procedure was innovative and experimental, and whether Drs. Arthur and Gocio were required to advise Adams prior to obtaining his consent, "of the innovative nature of the operation

and the available options and dangers involved." *See Trantafello, supra* at 87. However, we are unable to say that the doctors' alleged omissions in failing to so inform Adams, or the character of the representations the doctors actually made, rise to the level of "some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." *See Norris, supra.* Significantly, Arthur made no representations as to what sort of material would be used in the surgery. Adams later acquired knowledge that Orthoblock was used on the first office visit following surgery. While some of Arthur's statements were arguably misrepresentations about efficacy, *i.e.*, "he told me. . .that he had not had any slip and had not had any other problems with an Orthoblock," it "fuse[d] with bone," these statements do not rise to the level of affirmative representations sufficient to create a fact question as to fraudulent concealment. Based on the evidence submitted in the *Adams* case, we conclude that there exists no fact question as to fraudulent concealment, and affirm the grant of summary judgment to the appellee doctors.

### b. *Randy Stewart and Deondra Stewart, No. 96-1405.*

On May 24, 1990, Arthur, assisted by Gocio, performed a surgical procedure on Randy Stewart's neck. Stewart filed his complaint on March 11, 1993. Prior to surgery, he met with Gocio to discuss the procedure. Gocio told him that rather than use bone from his hip, he would use an artificial bone, which was growing in his laboratory. Stewart was on pain medication at the time, and was not given any other options nor was anything else explained to him about the material.

Here we have a different representation than that made in the *Adams* case. Gocio allegedly told Stewart that he would use an "artificial *bone*" growing in his lab. We hold that this affirmative statement, an arguable misrepresentation as to the nature of the material to be used in the surgery, is at least sufficient to create a fact question as to fraudulent concealment. This constitutes proof leaving room for a reasonable difference of opinion as to whether the Stewarts' causes of action were fraudulently con-

cealed. The summary judgment to the appellee doctors is reversed in the *Stewart* case and the case is remanded for further proceedings consistent with this opinion.

### c. Orville Beavers and Mary Beavers, No. 96-1470.

On December 11, 1989, Arthur performed surgery on Orville Beavers's neck, and his complaint was filed on February 12, 1993. Prior to the surgery, he met with Arthur to discuss the procedure. Arthur told him that he would use bone from the bone bank. His wife had this surgery before and they used a hip bone. No options were offered to him and he was simply told that Arthur would use a bone from the bone bank. Arthur did not advise him of any risk. He did not learn that he had Orthoblock in his neck until after he saw a newspaper article in January of 1993, and he obtained his medical records.

 Here, Orville Beavers alleged that Arthur told him that he would use bone from the bone bank in his surgery. This is evidence of an affirmative act that would have prevented Beavers from learning the actual nature of the material used in his surgery. We, therefore, hold that this alleged misrepresentation is sufficient to create a fact question as to fraudulent concealment. Accordingly, we reverse the grant of summary judgment to the appellee doctors in the *Beavers* case, and remand for further proceedings consistent with this opinion.

> 2. Deborah Ann Johnson and John Johnson, No. 96-1355; Kenneth Mitchell and Jan Mitchell, No. 96-1406; Patricia Foshee and Carl Foshee, No. 96-1407; Carl and Priscilla Rae, No. 96-1408; Sheila Orrell and Tommy Orrell, No. 96-1409; Ludivinia Gallegos Miller, No. 96-1414; Phyllis Dexter, No. 96-1415.

In addition to the evidence set forth above, appellants in these St. Joseph's cases submitted supplemental items of evidence in response to the appellees' motions for summary judgment. This included deposition testimony from Gayle Sanders, a nurse at St. Joseph's. According to Sanders, Arthur told her that St. Joseph's was going to be using Orthoblock as one of several hospi-

tals around the United States that would be trying Orthoblock. At the time, she knew that Orthoblock had been approved by the FDA for use in dental applications, but that it had not been approved for use in the spine. She did not have any conversations with anyone about this non-approval because "it was something we were already doing. It was just a new technique, and I didn't feel it was necessary." Sanders told her charge nurse to order the Orthoblock, telling her that it was a new product that they would be using. To her knowledge, Orthoblocks were not taken to the hospital's human subjects committee or institutional review board for purposes of use in the spine. She further explained that she was never present when Arthur or Gocio talked to a patient about using Orthoblock because it was done prior to surgery. At one time, the maintenance department revised an instrument to make it blunt for use with the Orthoblock. She also recalled that at one time Calcitek representatives came down to observe an Orthoblock surgery. Since the first lawsuit was filed, she was informed to bring the Orthoblock out of the operating room. Since then, it had not been ordered.

A St. Joseph's memo dated February 8, 1993, set forth the approval process for submission of a research protocol to St. Joseph's Institutional Review Board ("IRB"). All proposals for research involving human subjects at St. Joseph's were required to be submitted to the IRB for review pursuant to Department of Health and Human Services regulations. This included research involving medical devices for non-approved applications. St. Joseph's business minutes, dated May 15, 1990, state that a conference call was conducted by the Institutional Review Committee at St. Joseph's Regional Health Center/ AMI National Medical Center. This included approval for a protocol and informed consent regarding clinical evaluation of a "HAP Porous BiMetric Hip System" to be used in an investigational hip prothesis study. A December 13, 1991, St. Joseph's bill to a patient named John Hall included a charge for an Orthoblock at the price of $304.25.

Terri Baker, Calcitek's director of marketing, wrote a letter dated April 17, 1991, to Arthur and Gocio following her observation of a surgery. The letter explains that Calcitek had discussed with its engineers a tap for use with the block. "We do have some

preliminary ideas and should be able to get a prototype to you in the next thirty days. We will include the plastic tip! This should reduce the number of cracked blocks."

Arthur and Gocio also executed confidentiality agreements with Calcitek on April 8, 1991, abstracted as follows:

> All information of a technical nature imparted to or learned by me during the course of my association with the company with respect to the business of the Company including but not limited to formulas, patterns, devices, processes, compilations of information, specifications, research and development, and inventions, improvements, and discoveries within the scope of paragraph 1, shall be deemed confidential and shall not be disclosed by me to anyone outside the employ of the Company unless such information has been generally available to the trade.

Because federal law prohibited Calcitek from promoting uses other than those indicated, Calcitek had the doctors execute "custom device agreements" so that pursuant to federal law, Calcitek could provide Orthoblocks to individual doctors using them in anterior cervical discectomy procedures on a custom basis. Arthur and Gocio executed this form, which contained an acknowledgment that the doctors would "adequately inform the patient prior to use of this CUSTOM DEVICE."

The appellants also attached as exhibits some hand-written notes from someone at Calcitek regarding a conversation with Gocio. Among other things, the notes provide that "Using Orthoblocks ~ 1 yr.; 3-5/ week; No mods used — has had fractures; Spreads vertebrae far enough to drop implant into place; no tapping (fear of fractures)." Other notes regarding a phone interview with Gocio indicate that he "had a lot of shatter prior to learning how to use."

These appellants also submitted affidavits from two experts, Dr. Robert North, and Claudia Jean Beverly, regarding St. Joseph's failure to meet the appropriate standards of care for usage of Orthoblock at the hospital. Beyond the common allegations in the appellants' affidavits already set forth above, these appellants also made individual allegations concerning their respective surgeries.

a. *Deborah Ann Johnson and John Johnson, No. 96-1355.*

On January 8, 1991, Arthur, assisted by Gocio, performed a surgical procedure on Deborah Johnson's neck. Johnson's complaint was filed on June 8, 1993. Prior to the operation, she met with Arthur at the hospital to discuss the procedure. Arthur told her that he would use a synthetic material from Switzerland as a graft material in her neck. He told her that after he put it in, everything would grow together. Arthur did not give her any choice but to use this material, and she was not advised or aware that she had any other options. Arthur told her that he had not had any problems with the material from Switzerland.

As in the *Adams* case, we affirm in the *Johnson* case because of the lack of evidence of positive acts of fraudulent concealment on the part of the doctors. Again, the additional evidence in this St. Joseph's case undoubtedly raises a factual issue as to the experimental nature of Orthoblock. However, as in the *Adams* case, this goes to the merits of the informed-consent claims, and does not rise to the level of fraudulent concealment. We are unable to say that the representations allegedly made by the doctors establish a fact question as to fraudulent concealment. With regard to the confidentiality agreements signed by the doctors, we note that these agreements were executed several months after all of the surgeries in these cases. In most of these cases it was over a year after the surgery. The record indicates that these agreements were obtained at Calcitek's initiative so that it could gather data for Orthoblock's use in the spine, and so that it could discuss product-development information with the doctors. Moreover, the custom device agreements, also obtained at Calcitek's initiative, required the doctors to adequately inform patients prior to using Orthoblock. While Johnson's surgery was relatively close in time to the execution of the confidentiality agreement, she was advised that a synthetic material would be used in her neck.

### b. Jan Mitchell and Kenneth Mitchell, No. 96-1406.

On March 13, 1990, Arthur performed a surgical procedure on Jan Mitchell's neck. Mitchell's complaint was filed on September 23, 1993. Prior to the surgery, she had a telephone conversation with Arthur to discuss the procedure. Arthur simply told her that she had a ruptured disc, and that she needed surgery. He did not tell her anything about the surgery or what he might use as a graft material. Her sister-in-law had previously had surgery performed by Arthur and in that surgery, he had used bone from the bone bank and Mitchell assumed that he would use bone from the bone bank in her surgery. She did not learn until after August 1993, when she became aware that other lawsuits had been filed and she then obtained her medical records, that Orthoblock had been used in her surgery.

We affirm the grant of summary judgment for the reasons stated in the *Johnson* case. However, it is noteworthy that in Mitchell's affidavit, Mitchell assumed bone from the bone bank would be used in her surgery, but the doctors in fact made no representations as to what material would be used. Thus, beyond the failure to inform, or a mere continuation of this nondisclosure, there must have been something more in order to create a fact question as to fraudulent concealment. *See Trantafello, supra.*

### c. Patricia Foshee and Carl Foshee, No. 96-1407; Carl Rae and Priscilla Rae, No. 96-1408; Sheila Orrell and Tommy Orrell, No. 96-1409; Ludivinia Gallegos Miller, No. 96-1414; Phyllis Dexter, No. 96-1415.

Arthur performed an operation on Patricia Foshee's neck on April 19, 1990. Her complaint was filed on February 12, 1993. Prior to this surgery, she met with Arthur to discuss the procedure. Arthur told her that he would use a synthetic disc in her neck. No options were offered to her, and she was simply told that Arthur would use this new material and that it would fuse with bone.

On November 15, 1989,[2] Arthur performed a surgical procedure on Carl Rae's neck. Rae's complaint was filed on April 5, 1993. Prior to the procedure, he met with Arthur. Arthur told him that he would use a synthetic disc so that he would not have to have two operations. Arthur told him that this was an all-new material and that it worked good, and that he had not had any problems with it. Arthur told him nothing else about this material.

On December 26, 1989, Arthur performed a surgical procedure on Sheila Orrell's neck. She filed her complaint on May 20, 1993. Prior to this surgery, she met with Arthur to discuss the procedure. He told her that he would go in the crease of her neck and would put in a plastic disc, which would give way with her other disc. She thought that this was something like a piece of plastic foam the way that Arthur described it. She had the impression that it was flexible. He did not tell her what the substance was, or whether it was new, and she was not given any options and was not aware of any other options.

On November 28, 1989,[3] Arthur performed a surgical procedure on Miller's neck. Miller filed her complaint on January 28, 1993. Prior to that surgery, she met with Arthur to discuss the procedure. Arthur told her that he would use a synthetic disc in her neck. No options were offered to her, and she was simply told that the new material would fuse with bone.

On February 22, 1990,[4] Arthur performed a surgical procedure on Dexter's neck. Her complaint was filed on June 17, 1993. Prior to the surgery, she met with Arthur to discuss the procedure. Arthur told her that he was going to use a new, synthetic hip bone. He did not explain anything else to her about the material, did not give her any options, and did not advise her of any risk.

 In these cases, we reverse the grant of summary judgment to the appellee doctors and remand for further proceedings

---

[2] Rae's affidavit in the record states that the procedure was on November 30, 1989.

[3] Miller's affidavit in the record states that the surgery was on April 19, 1990.

[4] Dexter's affidavit in the record states that the surgery was on February 2, 1990.

consistent with this opinion. The crucial allegations in these cases are the doctors' alleged representations concerning "synthetic *discs*" and an "artificial *hip bone*." A reasonable inference from these alleged statements concerning the nature of the material to be used is that the material was appropriate for use in the spine. Thus, these representations at a minimum create a fact question as to fraudulent concealment.

### 3. *Darlene Kinder and Eddie Kinder, No. 96-1354; David Trusty and Pam Trusty, No. 96-1365.*

The *Kinder* and *Trusty* cases are unique in that neither appellants' abstract contains the various exhibits that have been set forth above. In both of these cases the appellants only evidentiary responses to the appellees' motions for summary judgment were their own affidavits.

#### a. *Darlene Kinder and Eddie Kinder, No. 96-1354.*

According to Darlene Kinder's affidavit, Gocio operated on her neck on February 21, 1991. She filed her complaint on May 20, 1993. Prior to the surgery, Kinder met with Gocio to discuss the procedure. He stated that he had been having trouble with grafts from the hip holding up and would use a synthetic fiber. She asked if it was experimental, and he assured her that this was not experimental and that they were having good results with arthritic patients. Gocio did not give her any other options, and she trusted him to make the right decision. Gocio stated that this material would fuse better than bone from the bone bank or hip bone.

We reverse the grant of summary judgment to the doctors in the *Kinder* case. While Kinder had knowledge that a "synthetic fiber" would be used in her neck, Gocio allegedly told her that this material was "not experimental." Unlike the prior representations about efficacy set forth above, we hold that this representation creates a fact question as to fraudulent concealment. The alleged representation that the material was "not experimental" goes beyond a mere opinion as to Orthoblock's efficacy, e.g., they had "good results," and is arguably a false representation con-

cerning the surgery. Accordingly, we reverse and remand for further proceedings consistent with this opinion in the *Kinder* case.[5]

#### b. David Trusty and Pam Trusty, No. 96-1365.

On January 23, 1990, Gocio performed a surgery on David Trusty's neck. Trusty filed his complaint on February 12, 1993. Prior to this surgery, Trusty met with Gocio at the hospital and discussed the procedure. Trusty was aware of the possibility of using, as a graft material in his neck, bone from the bone bank as opposed to hip bone. These were the two options which Trusty understood he had. Trusty asked Gocio if he would use bone from the bone bank, as he did not want a separate incision on his hip. Gocio informed him that he would not use bone from the bone bank, but that he would perform a new procedure using a synthetic material. He did not identify the material by name, nor did he describe what it was made of. Gocio told him that he had been quite successful using the new material. Trusty was not given a choice about the use of materials, even though he wanted bone from the bone bank, and he was not told of any risks in using the synthetic material.

Following the surgery, he visited Gocio's office on February 26, 1990. Gocio examined an x-ray and told him that everything looked fine. In fact, the Orthoblock he had inserted had already fractured. At no time, even after he terminated his care with Gocio on September 17, 1990, was he told that the Orthoblock was fractured.

In the *Trusty* case, we reverse the grant of summary judgment to the appellee doctors, and remand for further proceedings consistent with this opinion. According to Trusty's affidavit, he went to Gocio's office for an x-ray. While Trusty alleged that his Orthoblock had already fractured, Gocio purportedly examined his x-ray and told him that everything "looked fine." Based on this evidence, we conclude that there exist genuine

---

[5] The *Kinder* case is also unique in that the Kinders are the only appellants to assert continuous treatment as a ground for reversal. Because we reverse and remand on grounds of fraudulent concealment, we need not address this argument.

issues of material fact as to whether the doctors fraudulently concealed the Trustys' causes of action. *See Jones v. Central Ark. Radiation Therapy, supra.*

### 4. Conclusion Summary — Appellee Doctors.

In conclusion, we emphasize that we do not equate a claim based on lack of informed consent with fraudulent concealment. We are concerned only with the timeliness of these causes of action, not their merits. There must be something more than nondisclosure, or a continuation of that nondisclosure, to toll the limitations period. However, at this stage of the proceedings, we are only asked to determine whether there exist genuine issues of material fact as to fraudulent concealment, keeping in mind that fraudulent concealment is better suited as a question of fact for the jury, unless the evidence leaves no room for a reasonable difference of opinion.

We reject appellants' contention that the failure of the doctors to inform them of the experimental nature of the Orthoblock constitutes fraudulent concealment. While the bulk of the evidence in these cases obviously raises a factual issue as to whether the doctors should have so informed the appellants, this goes to the merits of the underlying claims, and not fraudulent concealment. Such is the case in *Mitchell*, where Arthur allegedly made no representations to the appellant there. In looking for something more in the way of affirmative representations, we note that in some cases the doctors allegedly made representations that may be categorized as opinions concerning the efficacy of the material to be used in the surgeries; e.g.," he had not had any slip", "had not had any other problems with an Orthoblock," the Orthoblock "fuse[d] with bone," "everything would grow together," and "he had not had any problems with the material." This evidence viewed in a light most favorable to appellants, does not create a fact question as to fraudulent concealment. However, as an example of an affirmative representation concerning efficacy that crosses the line leaving room for a reasonable difference of opinion is the alleged statement in the *Kinder* case that the material was "not experimental."

The other broad category of statements allegedly attributable to the doctors concerns the nature of the material to be used. In some instances, these representations do not create a fact question as to fraudulent concealment, e.g., "manmade material" and "synthetic material." However, in other cases, "synthetic *disc,*" "plastic *disc,*" and "synthetic *hip bone,*" the references to "disc" and "bone", arguably give rise to an inference regarding the appropriateness of the material's use in the human spine, and, thus, create questions of fact as to fraudulent concealment.

## B. Appellee Hospitals.

With regard to fraudulent concealment, all appellants make the same arguments against the hospitals as they do with the doctors. We reject these arguments as to the appellee hospitals in all cases. First, it is unclear whether the appellants have even sufficiently pleaded fraudulent concealment against the hospitals. At least in the St. Joseph's cases, the plaintiffs' affidavits responding to the hospital's motions for summary judgment stated as follows:

> — [Hospital] had made no inquiry into the safety of the product orthoblock for use in human spines prior to allowing Arthur and Gocio to perform their first orthoblock surgery, or any time thereafter;
> — That [hospital] knew before Arthur and Gocio performed their very first orthoblock surgery that the patients would be experimented upon with a non-FDA approved product;
> — That [hospital] made no inquiry and had no information regarding the long-term effect of orthoblocks in the spines of humans and had they inquired of the manufacturer they would have learned that during the entire time Arthur and Gocio performed orthoblock surgery, the manufacturer had no scientific basis to support the use of orthoblock in the spines of human beings;
> — that [hospital] had developed no protocol to insure the patients were adequately informed of the risks involved in participating in an experiment with a product not approved by the FDA for spinal surgery;
> — that [hospital] knew from the very beginning that orthoblocks were not designed for use in application where it would undergo significant flexural, tensile or sheer forces, the very forces that are in the spine.

These allegations, as well as their experts' affidavits, go to the merits of appellants' underlying claims against the hospitals, i.e., the breach of the hospitals' duty of care owed to appellants. Indeed, an implicit facet of the appellants' fraudulent-concealment claims against the hospitals is that the hospitals owed them a duty to obtain their informed consent, a contention which the hospitals deny. We need not decide this issue. As we have already stated, failure to obtain informed consent does not equate to fraudulent concealment. To the extent that the hospitals may have owed the appellants such a duty, we would affirm as to the hospitals for the same reasons we expressed as to the doctors in the *Mitchell* case above. While there is evidence that the hospitals knew or should have known of the doctors' use of Orthoblock and its experimental nature (perhaps more so in the St. Joseph's cases than in the AMI cases), evidence of affirmative conduct on the part of the hospitals to conceal the appellants' causes of action is lacking. Even in the cases where we reverse as to the doctor appellees, we do so because of conduct on the part of the *doctors* evincing fact questions as to fraudulent concealment. During oral argument, counsel for appellants conceded that he was not proceeding against the hospitals on a theory of vicarious liability. There being no reason to impute this conduct to the hospitals, we reject the appellants' fraudulent-concealment argument as to the hospitals in the cases where we reverse as to the doctors.

## II. Product-Liability Claims.

The appellants next argue that the trial court erred in declining to find that the hospitals could be strictly liable as suppliers of the Orthoblock. The premise of their argument is that our Product Liability Act and our Strict Liability Act expose a larger class of defendants to liability than does Section 402A of the Restatement (Second) of Torts. Before addressing this issue, we deal with a mootness issue raised by the hospitals.

### A. Mootness.

Both hospitals contend that any viable strict liability claims against them are moot due to the appellants' settlement with Calcitek. In support of this argument they primarily rely on

*Sochanski v. Sears, Roebuck & Co.*, 689 F.2d 45 (3d Cir. 1982). In *Sochanski* the court drew a distinction between primary and secondary liability in product–liability claims. The appellant there executed a release in favor of the manufacturer of a defective tire, the party primarily liable. However, the seller had only acted as a "conduit" between the manufacturer and the purchaser, and was thus only secondarily liable. "Consequently, [the seller's] liability for any misfeasance on [the manufacturer's] part is discharged by the release in favor of [the manufacturer]." *Id.* The hospitals also highlight the indemnification provision of the Product Liability Act, which gives the supplier of a defective product a claim for indemnification against the product's manufacturer. *See* Ark. Code Ann. § 16–116–107 (1987).

We decline to hold that the appellants' product–liability claims against the hospitals are moot in these cases. The orders of dismissal with Calcitek in these records show only that "the matter has been compromised and settled, the above–styled cause against Defendant Calcitek, Inc. is hereby dismissed with prejudice." However, we do not have the benefit of any release between the appellants and Calcitek, and we would be left to speculate as to the terms of that release, as well as the potential viability of cross–claims between the parties.

B. *Statute of Limitations.*

While we do not hold that the appellants' product–liability claims against the hospitals are moot, we nonetheless affirm the grant of summary judgment in favor of the hospitals. In doing so, we do not decide whether a hospital, under these facts, may be strictly liable as a supplier. To the extent that these appellants have viable product–liability claims against the hospitals, they are all barred by the applicable limitations period found in the Medical Malpractice Act.

The Product Liability Act establishes a three–year statute of limitations, "All product liability actions shall be commenced within three (3) years after the date on which the death, injury, or damage complained of occurs." Ark. Code Ann. § 16–116–103. A "product liability action" "includes all actions brought for or on

account of personal injury, death, or property damage caused by, or resulting from, the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging, or labeling, of any product[.]" Ark. Code Ann. § 16-116-102(5).

By contrast, the Medical Malpractice Act's limitations period provides in part "that all actions for medical injury shall be commenced within two (2) years after the cause of action accrues." An "Action for medical injury" "means any action against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury." Ark. Code Ann. § 16-114-201(1). Furthermore, "medical injury" means "any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services; or from rendition of such services without informed consent or in breach of warranty or in violation of contract; or from failure to diagnose; or from premature abandonment of a patient or of a course of treatment; or from failure to properly maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services." Ark. Code Ann. § 16-114-201(3).

In exploring the plain language of both Acts, there is obviously a potential conflict lurking with regard to the limitations period for an action otherwise falling within the scope of the Product Liability Act, yet involving an allegedly defective product that is supplied by a medical-care provider in the course of rendering professional services. This is due to the Medical Malpractice Act's broadly inclusive language used in defining an action for medical injury, which includes any action against a medical care provider to recover damages on account of medical injury "whether based in tort, contract, or otherwise[.]" *See* Ark. Code Ann. § 16-114-201(1). The definition of "medical injury" is similarly inclusive, encompassing adverse consequences arising out of the rendition of professional services whether in "breach of warranty . . . or otherwise arising out of or sustained in the course of such services." *See* Ark. Code Ann. § 16-114-201(3). In the present cases, where the appellants attempt to hold the hospitals

liable for adverse consequences arising from an allegedly defective product supplied in the course of rendering a surgical procedure, the appellants' alleged injuries fall within the definition of medical injury, and the appellants' cause of action based on strict or product liability is an action for medical injury as that term is used in the Medical Malpractice Act. *Cf. Burris v. Hospital Corp. of America*, 773 S.W.2d 932 (Tenn. Ct. App. 1989) (product-liability action against hospital governed by statute of limitations for "medical malpractice action" when such action included "an action for death resulting from malpractice by a health care provider . . . whether based upon tort or contract law." — "Any ground which a plaintiff might state for recovery of civil damages must fall into one of the categories, contract or tort."). Thus, the conflict between the two statutes of limitations is readily apparent in these cases.

This is not the first time that this court has been confronted with conflicting statutes of limitations in interpreting the Medical Malpractice Act. In *Hertlein v. St. Paul Fire & Marine Ins. Co.*, 323 Ark. 283, 914 S.W.2d 303 (1996), this court held that the Medical Malpractice Act's two-year limitations period governed a wrongful-death action, despite the longer limitations period generally applicable to wrongful-death actions. *Cf. McQuay v. Guntharp*, 331 Ark. 466, 963 S.W.2d 583 (1998) (declining to reach merits of whether Medical Malpractice Act's two-year limitations period applied to outrage claim against a physician — appellant failed to obtain a ruling on this issue at the trial court level). The rationale behind the *Hertlein* decision was the general repealer clause contained in the Medical Malpractice Act, Act 709 of 1979. We noted that the Act expressly "applies to all causes of action for medical injury accruing after April 2, 1979, and, as to such causes of action, *shall supersede any inconsistent provision of law.*" *Hertlein*, *supra* (quoting Ark. Code Ann. § 16-114-202 (1987)) (emphasis in original).

Here, the statute of limitations found in the Medical Malpractice Act conflicts with that found in the Product Liability Act, and for that matter, the same limitations period applicable to claims brought pursuant to the Strict Liability Act. *See Harris v. Standardized San. Sys.*, 658 F. Supp. 438 (W.D. Ark. 1987)

(acknowledging that Strict Liability Act omits specific limitations period but applied three-year period found in Product Liability Act), *rev'd on other grounds*, 856 F.2d 64 (8th Cir. 1988). In resolving the conflict, we hold that the two-year limitations period found in the Medical Malpractice Act supersedes that found in the Product Liability Act.

We are not unmindful of the fact that the Product Liability Act, Act 511 of 1979, and the Medical Malpractice Act, Act 709 of 1979, were enacted in the same legislative session, and that such an implied repealer is not favored. *See generally* 1A *Sutherland Statutory Construction* § 23.17 (5th ed. 1993); *see also Matthews v. Travelers Indemnity Ins. Co.*, 245 Ark. 247, 432 S.W.2d 485 (1968) (policy is to use longer limitations period where the issue is "doubtful"). However, the Medical Malpractice Act, as the latter enactment within the session, may be seen as the prevailing expression of legislative intent. *See Williams v. State*, 215 Ark. 757, 223 S.W.2d 190 (1949) ("As between two acts, it has been held that one passed later and going into effect earlier will prevail over one passed earlier and going into effect later."); *but see Citizens to Establish a Reform Party v. Priest*, 325 Ark. 257, 926 S.W.2d 432 (1996) ("Where Acts passed at the same session contain conflicting clauses, the whole record of legislation will be examined to ascertain the Legislative intent, and such intent, if ascertained, will be given effect, regardless of priority of enactment."); *Horn v. White*, 225 Ark. 540, 284 S.W.2d 122 (1955) (declining to mechanically apply "last passed" rule).

For these reasons, and in light of the all-inclusive language used by the General Assembly in defining an action for medical injury to encompass those actions "whether based in tort, contract, or otherwise," we conclude that the Medical Malpractice Act's two-year statute of limitations governs the appellants' product-liability claims brought against the hospitals. Accordingly, the trial court did not err in granting summary judgment to the appellee hospitals on the appellants' product-liability claims.

In so holding, we are also cognizant of *Spickes v. Medtronic*, 275 Ark. 421, 631 S.W.2d 5 (1982), where this court applied the Product Liability Act's three-year statute of limitations in the context of a product-liability claim brought against the manufacturer

of a pacemaker as well as the "hospital through which the device was sold[.]" *Id.* However, *Spickes* presented no issue as to whether the Medical Malpractice Act's two-year statute would otherwise govern. Therefore, *Spickes* is not dispositive here.

### III. Constitutionality of the Medical Malpractice Act's Limitation Period.

 The appellants' final point on appeal concerns the constitutionality of the Medical Malpractice Act's statute of limitations, Ark. Code Ann. § 16-114-203. They argue that section 16-114-203 is a statute of repose which is violative of the Arkansas Constitution's guarantees of equal protection of the laws and their rights to a jury trial and redress of wrongs. The appellants also contend that the statute's exception to the general two-year statute of limitations based on foreign-object claims violates the Arkansas Constitution's guarantee of equal protection. The crux of the appellants' equal protection argument is that this court should apply a heightened level of scrutiny in reviewing the statute. While it is true that the statute may be more accurately described as a statute of repose, we decline to apply strict scrutiny in examining the statute's constitutionality. Instead, the applicable standard of review is rational basis.

For example, in *Carter v. Hartenstein*, 248 Ark. 1172, 455 S.W.2d 918 (1970), this court upheld the application of a statute of repose for actions against architects and designers. The statute at issue there required that personal injury and wrongful-death actions against a designer, planner, or constructor of a building or improvement be brought within four years from the date of substantial completion of the project regardless of the date that injury arose as a result of the defect. The appellant in *Carter* challenged the statute, asserting it violated due process, equal protection, as well as the Article 2, Section 13, redress of wrongs guarantee. The crux of appellant's argument was that the statute unconstitutionally gave protection to those enumerated in the statute while failing to give the same protection to others such as materialmen and owners, whom the appellant claimed belonged in the same class as those exempted. This court framed the issue as "whether it is fair and reasonable and an appropriate action by the General Assembly of the State of Arkansas, or whether it impinges and frustrates

basic rights guaranteed constitutionally." *Id.* In answering that question, this court held that the statute was "valid, reasonable, constitutional and not enacted for arbitrary or capricious reasons." *Id; see also Chapman v. Alexander*, 307 Ark. 87, 817 S.W.2d 425 (1991) (upholding limitations period in legal malpractice actions). The *Carter* court noted that a "vital distinction" based on control of the premises existed between owners or suppliers and those engaged in the professions and occupations of design and building. This distinction was not arbitrary or unreasonable and was a legitimate exercise of legislative function.

The constitutional guarantee of equal protection does not prohibit legislation affording different treatment for persons in different classifications so long as there is a rational basis for the different classifications and they have some reasonable relation to the objectives of the legislation. *Holland v. Willis*, 293 Ark. 518, 739 S.W.2d 529 (1987). Of course, any statute of limitations will eventually operate to bar a remedy, and the time within which a claim should be asserted is a matter of public policy, the determination of which lies almost exclusively in the legislative domain, and the decision of the General Assembly in that regard will not be interfered with by the courts in the absence of palpable error in the exercise of the legislative judgment. *Owen v. Wilson*, 260 Ark. 21, 537 S.W.2d 543 (1976). Simply put, it is the General Assembly's prerogative to set a time in which a claim must be brought. Such a determination is a matter of public policy. We are unable to say that the limitations period found in section 16-114-203 lacks a rational basis, or deprives a claimant of a constitutional right to redress of wrongs or a jury trial.

Appellants next contend that within section 16-114-203 itself exists an unconstitutional distinction between foreign-object medical malpractice claimants and typical medical malpractice claimants. *See* Ark. Code Ann. § 16-114-203(b) ("where the action is based upon the discovery of a foreign object in the body of the injured person which is not discovered and could not reasonably have been discovered within such two-year period, the action may be commenced within one (1) year from the date of discovery or the date the foreign object reasonably should have been discovered, whichever is earlier.") Appellants point out that

in *Treat v. Kreutzer*, 290 Ark. 532, 720 S.W.2d 716 (1986), we alluded to the "very respectable authority" from other jurisdictions holding such a distinction to be unconstitutional as a denial of equal protection of the laws. As examples of such authority, the appellants direct us to other courts that have struck down a foreign-object distinction. Typical is *Austin v. Litvak*, 682 P.2d 41 (Colo. 1984), where the Colorado Supreme Court held that the distinction between foreign-object claimants and normal claimants was an arbitrary classification. The *Austin* court could find no rational basis for distinguishing between the two classes of medical malpractice claimants. While the court recognized a legitimate state interest in foreclosing the prosecution of stale or frivolous claims, the classification which resulted in the denial of the discovery rule to patients whose conditions were negligently misdiagnosed did not further this interest, and therefore lacked a "rational relationship to that goal." *Id.*

By way of contrast, other courts have upheld a similar foreign-object plaintiff distinction. In *Ross v. Kansas City Gen. Hosp. & Med. Ctr.*, 608 S.W.2d 397 (Mo. 1980) (en banc), the court noted that the legislature may have recognized the unfairness in barring a claim where a foreign object had been left in the claimant's body before the object had been discovered. Moreover, the legislature may have deemed the time of discovery in foreign-object cases appropriate rather than the date of injury because "there is less likely to be as great a problem with stale evidence when a foreign object is left in the body than in the other types of malpractice cases." *Id.* *See also Allrid v. Emory University*, 285 S.E.2d 521 (Ga. 1982) (noting that in foreign-object cases "the danger of belated, false or frivolous claims is eliminated.").

 Here we are merely asked to determine whether there exists any rational basis which demonstrates the possibility of a deliberate nexus with state objectives, so that the legislation is not the product of utterly arbitrary and capricious government purpose and void of any hint of deliberate and lawful purpose. *See Hamilton v. Hamilton*, 317 Ark. 572, 879 S.W.2d 416 (1994). In light of staleness considerations that are not as likely present in foreign-object cases, we conclude that a rational basis exists for the Medical Malpractice Act's exception to its limitations period in

such cases. The trial court did not err in declining to find the limitations period unconstitutional as violative of equal protection.

Nos. 96-1350, 96-1355, 96-1406; affirmed. Nos. 96-1405, 96-1407, 96-1408, 96-1409, 96-1414, 96-1415, 96-1365, 96-1354, 96-1470; affirmed in part; reversed and remanded in part.

Special Justices BOB LESLIE, JIM PENDER, WARREN DUPWE, and LEANNE DANIEL join in this opinion.

NEWBERN, GLAZE, CORBIN, and BROWN, JJ., not participating.