Armond JOHNSON; Cecil B. Lane and Betty J. Lane *v.*
James ARTHUR, M.D., Allan C. Gocio, M.D.,
Hot Springs Neurosurgery Clinic, P.A., Calcitek, Inc.,
Sisters of Mercy Health Systems, Inc., as Administrator of the
Sisters of Mercy Health System—St. Louis Pooled
Comprehensive Liability Agreement, and
St. Joseph's Regional Health Center, Inc.

CA 98-660; 986 S.W.2d 874
CA 98-661

Court of Appeals of Arkansas
Division III
Opinion delivered March 3, 1999

*Hicks Law Firm*, by: *George R. Wise, Jr.*, for appellant Armond Johnson.

*Friday, Eldredge & Clark*, by: *William M. Griffin III* and *Jason B. Hendren*, for appellees.

JOHN F. STROUD, JR., Judge. In each of these two companion cases, the Garland County Circuit Court granted summary judgment in favor of appellees James Arthur, M.D., Allan Gocio, M.D., and Hot Springs Neurosurgery Clinic, P.A. Although the cases were not consolidated at trial or for appeal, they were submitted simultaneously to this court, and we dispose of them in this one opinion. We affirm both cases because no genuine issues of material fact remain for trial.

On February 27, 1990, Dr. Arthur operated on Armond Johnson to remove a herniated cervical disc and to perform a fusion of his cervical vertebrae. On June 18, 1991, Dr. Arthur

performed the same surgery on Cecil Lane. In performing these surgeries, Dr. Arthur used hydroxylapatite, known by the trade name "Orthoblock," as spinal spacers. Both appellant Johnson and appellants Lane filed complaints against appellees on June 14, 1995, alleging negligence in Dr. Arthur's implantation of Orthoblock without their knowledge and informed consent. Appellees moved for summary judgment on the ground that appellants' claims were barred by the limitations period set forth in the Arkansas Medical Malpractice Act, Ark. Code Ann. § 16-114-203(a) (Supp. 1997).

In response to appellees' motion for summary judgment, Mr. Johnson filed an affidavit wherein he recited facts about Orthoblock of which Dr. Arthur had not informed him and stated:

> On February 27, 1990, Dr. James Arthur performed surgery on my neck at St. Joseph's Regional Health Center. Prior to this surgery, I met with Dr. Arthur to discuss the surgery. He informed me that he would remove a ruptured disc and replace it with a new product which he described as a porous ceramic which had small holes in it which would allow bone to attach to it. He recommended this porous ceramic and said he had had good results with it.

Similarly, Mr. Lane filed an affidavit in response to appellees' motion for summary judgment in his case, in which he stated:

> On June 18, 1991, Dr. James Arthur performed surgery on my neck at St. Joseph's Regional Health Center. Prior to this surgery, I met with Dr. Arthur to discuss the procedure. We did not discuss graft materials and I assumed that bone from my hip would be used. When I woke up in the hospital after the procedure, I asked Dr. Arthur why my hip did not hurt and he told me that he had used a different procedure. He never mentioned the product Orthoblock or that he had used it in my neck.

In their respective responses to appellees' motions for summary judgment, appellants also filed portions of depositions, affidavits, copies of Dr. Arthur's and Dr. Gocio's confidentiality agreements with Calcitek, the manufacturer of Orthoblock, and documents obtained in discovery from Calcitek. In his deposition, Dr.

Arthur admitted that Orthoblock had never been approved by the Food and Drug Administration for use in the spinal column.

In both cases, the circuit judge granted summary judgment for appellees on February 25, 1998, and stated:

> 1. Ark. Code Ann. § 16-114-203 provides the controlling two-year statute of limitations applicable to the facts of this case.
>
> 2. Plaintiffs' Complaint was filed more than two years after the date of the alleged wrongful act.
>
> 3. Plaintiffs' claim that the statute of limitations was tolled by fraudulent concealment on the part of the Defendants is without sufficient factual support in the record before the Court and is rejected. The use of the Orthoblock device during the surgery in question is an issue of informed consent and not an issue of fraudulent concealment of a negligent act.
>
> . . . .
>
> 5. Plaintiffs' claims against all Defendants are barred by the statute of limitations and the Defendants are entitled to judgment as a matter of law.

Appellants argue on appeal that granting of summary judgment to appellees was erroneous because genuine issues of material fact existed as to whether the statute of limitations was tolled by fraudulent concealment.

█ █ The legal principles that govern our review of a trial court's grant of summary judgment are well established. Summary judgment should be granted only when a review of the pleadings, depositions, and other filings reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Johnson v. Harrywell, Inc.*, 47 Ark. App. 61, 885 S.W.2d 25 (1994). In considering a motion for summary judgment, the court may also consider other documents such as pleadings, answers to interrogatories, admissions, and affidavits. *Muddiman v. Wall*, 33 Ark. App. 175, 803 S.W.2d 945 (1991). When the movant makes a prima facie showing of entitlement, the respondent must meet proof with proof by showing a genuine issue as to a material fact. *Johnson v. Harrywell, Inc., supra.*

In appeals from the granting of summary judgment, this court reviews facts in a light most favorable to the appellant and resolves any doubt against the moving party. *Id.* Summary judgment is not proper where evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ. *Id.* On appellate review, we need only decide if the granting of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of a motion left a material question of fact unanswered. *Id.*

These cases are controlled by the supreme court's recent decision in *Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998), wherein twelve similar cases concerning this issue were consolidated for purposes of appeal. In that case, the appellants were patients of Drs. Arthur and Gocio, and each appellant alleged that he or she was damaged as a result of the implantation of Orthoblock.

The relevant statute of limitations, Ark. Code Ann. § 16-114-203 (Supp. 1997), provides that all actions for medical injury shall be commenced within two years after the cause of action accrues and that the date of the accrual of the cause of action shall be the date of the wrongful act complained of and no other time. When the running of the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading this defense. *Adams v. Arthur, supra.* However, once it is clear that the action is barred by the applicable statute of limitations, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was in fact tolled. *Id.* Fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *Id.* Although the question of fraudulent concealment is normally a question of fact, and is not suited for summary judgment, when the evidence leaves no room for a reasonable difference of opinion, a trial court may resolve fact

issues as a matter of law. *Id.; Smothers v. Clouette*, 326 Ark. 1017, 934 S.W.2d 923 (1996).

In nine of the cases decided in *Adams v. Arthur*, the supreme court held that genuine issues of material fact remained on the question of fraudulent concealment; it reversed the summary judgments entered in those cases and remanded them for trial. In the other three cases, the court found no genuine issues of fact remaining and affirmed the orders granting summary judgment. The supreme court made it clear at the outset that it rejected the appellants' contention that in all informed-consent cases there will always be issues of material fact as to fraudulent concealment. The court noted that the appellants' argument obliterated any distinction between nondisclosure and fraudulent concealment in claims involving failure to obtain informed consent. The court stated: "To equate an alleged breach of a physician's duty to obtain a valid informed consent with a fact question as to fraudulent concealment would effectively destroy the limitations period that begins running from the moment of medical injury." 333 Ark. at 65, 969 S.W.2d at 604. The court cited a California case, *Trantafello v. Medical Center of Tarzana*, 182 Cal. App. 3d 328, 227 Cal. Rptr. 84 (1986), wherein the court held that intentional concealment has to be something more than a lack of informed consent or the mere continuation of a prior nondisclosure.

In *Adams v. Arthur, supra,* the supreme court stated that certainly, evidence of affirmative misrepresentations, either in connection with or subsequent to the appellants' surgeries, may create a fact question of tolling the limitations period for the jury. The court stated that fraudulent concealment, however, must go beyond a mere failure to obtain an adequate informed consent; it must rise to the level of some positive act of fraud that is so furtively planned and secretly executed as to keep the plaintiffs' cause of action concealed or perpetrated in such a way that it conceals itself. The supreme court summarized its conclusions as follows:

> In conclusion, we emphasize that we do not equate a claim based on lack of informed consent with fraudulent concealment. We are concerned only with the timeliness of these causes of

action, not their merits. There must be something more than nondisclosure, or a continuation of that nondisclosure, to toll the limitations period. However, at this stage of the proceedings, we are only asked to determine whether there exist genuine issues of material fact as to fraudulent concealment, keeping in mind that fraudulent concealment is better-suited as a question of fact for the jury, unless the evidence leaves no room for a reasonable difference of opinion.

We reject appellants' contention that the failure of the doctors to inform them of the experimental nature of the Orthoblock constitutes fraudulent concealment. While the bulk of the evidence in these cases obviously raises a factual issue as to whether the doctors should have so informed the appellants, this goes to the merits of the underlying claims, and not fraudulent concealment. Such is the case in *Mitchell*, where Arthur allegedly made no representations to the appellant there. In looking for something more in the way of affirmative representations, we note that in some cases the doctors allegedly made representations that may be categorized as opinions concerning the efficacy of the material to be used in the surgeries; e.g., "he had not had any slip," "had not had any other problems with an Orthoblock," the Orthoblock "fuse[d] with bone," "everything would grow together," and "he had not had any problems with the material." This evidence viewed in a light most favorable to appellants, does not create a fact question as to fraudulent concealment. However, as an example of an affirmative representation concerning efficacy that crosses the line leaving room for a reasonable difference of opinion is the alleged statement in the *Kinder* case that the material was "not experimental."

The other broad category of statements allegedly attributable to the doctors concerns the nature of the material to be used. In some instances, these representations do not create a fact question as to fraudulent concealment, e.g., "manmade material" and "synthetic material." However, in other cases, "synthetic *disc*," "plastic *disc*," and "synthetic *hip bone*," the references to "disc" and "bone," arguably give rise to an inference regarding the appropriateness of the material's use in the human spine, and, thus, create questions of fact as to fraudulent concealment.

333 Ark. at 82-83, 969 S.W.2d at 612-13.

### a. Armond Johnson, No. CA 98-660

Appellant Johnson asserts that prior to his surgery, Dr. Arthur explained that he would remove a ruptured disc and replace it with a new product that he described as a porous ceramic with small holes in it that would allow bone to attach to it. Dr. Arthur recommended this porous ceramic and said that he had obtained good results with it. Johnson contends on appeal that Dr. Arthur misrepresented the nature of the product Orthoblock, leading him to believe that its use was appropriate in the human spine; that Dr. Arthur told him that Orthoblock was a porous ceramic when in fact it is a dense, non-reabsorbable ceramic; and that Dr. Arthur told him that Orthoblock would allow bone to attach to it when in fact Orthoblock does not attach to bone. He argues that Dr. Arthur's representations were sufficient to create a fact question for the jury regarding fraudulent concealment. We disagree because *Adams v. Arthur* requires that we do so.

We find that Mr. Johnson's case is similar to that of Deborah Ann Johnson, described in *Adams v. Arthur,* in which Dr. Arthur informed Mrs. Johnson that he would use a "synthetic material" from Switzerland as a graft material, that after it was implanted "everything would grow together," and that he had not had any problems with the material. Summary judgment was held proper in Mrs. Johnson's case because of the lack of evidence of positive acts of fraudulent concealment on Dr. Arthur's part. *Id.* at 77, 969 S.W.2d at 610. The court found that although the doctor's statements may have raised a fact issue as to the experimental nature of Orthoblock, this went to the merits of an informed-consent claim and did not rise to the level of fraudulent concealment. *Id.*

██ In Armond Johnson's case, we must follow the mandates of *Adams v. Arthur.* Thus, we find that Dr. Arthur's reference to Orthoblock as a "porous ceramic" is comparable to use of the term "synthetic fiber" or "synthetic material" and relates to the nature of the material without inferring the appropriateness of its use in the human spine. The statement that the material "would allow bone to attach to it" is an opinion concerning the

efficacy of the material to be used. Neither statement creates a fact question as to fraudulent concealment according to *Adams v. Arthur*. Therefore, applying the *Adams* standard, we find that Armond Johnson has not established the existence of a genuine issue of material fact as to fraudulent concealment, and we affirm the grant of summary judgment.

### b. Cecil Lane, No. CA 98-661

 Cecil Lane contends that one may infer from his affidavit that he was told that hip bone would be used in his surgery and that, when he inquired of Dr. Arthur as to whether hip bone had been used, Dr. Arthur's statement that he had used a "different procedure" amounts to fraudulent concealment. He also contends that Dr. Arthur did not take advantage of this opportunity to "come clean" and admit that he had experimented upon him. In *Adams v. Arthur, supra,* Dr. Arthur had not told Jan Mitchell anything about the product he might use as a graft material; instead, Mrs. Mitchell had simply assumed that bone from the bone bank would be used. In the present case, Cecil Lane also "assumed" that hip bone would be used. After the surgery, when Mr. Lane asked Dr. Arthur why he had not used hip bone, Dr. Arthur told him that he had performed a "different procedure." Therefore, Dr. Arthur did not make a representation that would arguably give rise to an inference as to the appropriateness of Orthoblock's use in the human spine. Accordingly, following the guidance set forth in *Adams v. Arthur* as we must, we simply cannot say that appellants Lane have demonstrated the existence of a genuine issue of fact as to fraudulent concealment. We therefore affirm the grant of summary judgment in this case also.

Affirmed.

MEADS, J., agrees.

ROAF, J., concurs.

A NDREE LAYTON ROAF, Judge, concurring. I agree that these cases must be affirmed because of the supreme court's decision in *Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598

(1998). The *Adams* decision has foreclosed any further inquiry by this court into the failure of the appellee doctors to disclose to the appellants that they intended to use a novel or experimental product in their spinal surgeries, by treating this failure as simply an issue of informed consent and, accordingly, governed by the two-year medical malpractice statute of limitations. In so doing, our supreme court has recognized no distinction between the garden-variety informed consent cases and the situation in which, as in the instant case, a medical provider, without the knowledge or consent of a patient, in effect conducts an experiment on the patient. However, the California intermediate appellate court decision that our supreme court relied upon in the *Adams* decision, *Trantafello v. Medical Ctr. of Taranza*, 182 Cal. App. 3d 315, 227 Cal. Rptr. 84, (Cal. Dist. Ct. App. 1986), also failed to acknowledge that there is or should be a distinction. The appellants in the instant case argue that such an act constitutes fraudulent concealment in and of itself, but this argument is unavailing after *Adams*. Indeed, under the *Adams* decision, the less the doctors told the appellants about the proposed surgical procedure, the better off they were in terms of tolling the statute. Where they said nothing at all about the nature of the material to be used, the supreme court found no misrepresentation, and no tolling of the statute.

However, some authorities have distinguished between medical treatment and medical experimentation, and have suggested that the law of informed consent may be an inadequate standard when human-subject experimentation is involved. In K. Morin, *The Standard of Disclosure in Human Subject Experimentation*, 19 J. LEGAL MED. 157 (1998), the author describes medical interventions as falling within four categories: standard treatment; innovative treatment; clinical/therapeutic research; or nontherapeutic research. The latter two categories were introduced in the Declaration of Helsinki, *see* R. Levine, *Ethics and Regulation of Clinical Research* 427 (2d ed. 1986), and are widely accepted as falling within the ambit of the common definition of experimentation, entitling the subjects to full protection of federal regulations. With regard to innovative treatment, the author states:

> [I]nnovative therapies, however, have been the object of much controversy, and it remains unclear how the law of informed consent should be applied. . . . The attempt to delineate research and treatment has deep implications for the informed consent requirement. If the distinction is viewed as superfluous, then a uniform standard of disclosure arguably would apply in both contexts. On the contrary, if they remain distinct, then there is reason to believe that the nature of the intervention will dictate different standards, according to the level of protection needed.

In D. Giesen, *Civil Liability of Physicians for New Methods of Treatment and Experimentation: A Comparative Examination*, 3 MED. L. REV. 22 (1995), another authority further distinguishes between the inadequate disclosure of risks involved in innovative therapeutic treatment, and the nondisclosure of the innovative nature of the treatment itself, suggests that the distinction is unnecessary and undesirable, and contends that "the individual doctor trying out new techniques is undeniably engaged in medical experimentation. It is unacceptable . . . to place the burden of this experimentation upon the patient by confining his right of recovery in relation to consent to the tort of negligence."

However, although nondisclosure of the innovative nature of medical treatment has been held to be a battery in a landmark Canadian case, *see Zimmer v. Ringrose* [1981] 28 A.R. 69, given the one-year Arkansas statute of limitations for intentional torts, such an interpretation would be meaningless to the appellants in the instant case.

An unfortunate result of the *Adams* decision is that Arkansas medical providers are now free to conduct experimental medical procedures upon their patients, without any disclosure whatsoever of the experimental nature of the treatment, and, unless any resulting harm is manifested within the two-year medical malpractice limitations period, without any concern for the consequences.